536 A.2d 1182

**GIANT FOOD, INC. et al.**

v.

**ICE KING, INC. et al.**

**No. 754 Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Feb. 9, 1988.

Certiorari Denied June 16, 1988.

William B. Spellbring (Robert J. Farley and O'Malley, Miles & Harrell on the brief) Upper Marlboro, for appellants.

Paul Mark Sandler (Ralph E. Wilson and Freishtat and Sandler, on the brief) Baltimore, for appellees.

Argued before GILBERT, C.J., and ALPERT, and ROBERT M. BELL, JJ.

GILBERT, Chief Judge.

"Words," Justice Frankfurter said, "are clumsy tools, and it is very easy to cut one's fingers with them." [1] The question we must answer in this appeal is whether the appellants cut their fingers on their own words.

A jury in the Circuit Court for Howard County (Fischer, J.) decided that Giant Food, Inc., and two of its employees, George Knippen and William Hendricks, had, by their words and actions, negligently misrepresented certain facts to Ice King, Inc., and Richard Epple. The jury returned a verdict in favor of Ice King in the amount of $182,265.00 and $1.00 for Epple. Believing themselves wronged by that decision, Giant, Knippen, and Hendricks have appealed to this Court, where they posit the single issue:

"Whether certain statements made by the individual Appellants ... to ... Epple were sufficient for [the purpose] of imposing liability on the part of Appellants for the tort of negligent misrepresentation."

The brunt of appellants' attack on the judgment of the circuit court is bivalved: First, they assert that no duty was owed to the appellees, under the facts of the case and,

---

1. Felix Frankfurter in *Some Reflections on the Reading of Statutes* (New York: Association of the Bar of the City of New York, 1947, p. 29).

second, that even if a duty was owed the appellees "were not justified in relying upon the appellants' statements." We shall discuss each of those facets of appellants' argument in the order in which they are posed, supplying any additional facts necessary to a better understanding of the issue under consideration. In so doing, we shall focus on the evidence adduced by the appellees, in the light most favorable to them, as we must when testing the sufficiency of the evidence. *See Impala Platinum Limited v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887 (1978).

### Duty

Appellants contend that there was insufficient evidence for the jury to have found a duty of care on the part of Giant. They assert that there were "no words spoken or correspondence written between the parties creating, acknowledging or accepting a duty, or otherwise confirming the existence of a duty passing from Appellants to Appellees." The crux of appellants' argument is that there was no oral or written contract adduced at trial, no "special relationship" was shown to have existed, and there were no dealings between the parties that created a duty on appellants' part to speak truthfully.

"The action for negligent misrepresentation was created to provide a tort remedy for the plaintiff who had acted in reliance upon the false [2] statement of a defendant whose conduct in uttering the statement was culpably careless, but not deliberately fraudulent, and who was aware that the plaintiff would reasonably act in reliance upon the statement."

Note, *Deceit and Negligent Misrepresentation in Maryland,* 35 Md.L.Rev. 651, 673 (1976).

---

**2.** It need not be proven that the defendant knew that the statement was false. "All that the plaintiff need show in that respect is that the statement was negligently made without regard to whether it was true or false." Gilbert, *Maryland Tort Law Handbook,* § 17.5.1 at 181 (1986).

The signal case in Maryland on negligent misrepresentation is *Virginia Dare Stores, Inc. v. Schuman,* 175 Md. 287, 1 A.2d 897 (1938). Note, *supra,* 35 Md.L.Rev. at 662. Although *Virginia Dare* involved personal injury occasioned by negligent misrepresentation, the cause of action has been sustained where the "injury" was limited to pecuniary loss. *See Leonard v. Sav-A-Stop Servs., Inc.,* 289 Md. 204, 424 A.2d 336 (1981); *St. Paul at Chase Corp. v. The Manufacturers Life Ins. Co.,* 262 Md. 192, 278 A.2d 12 (1971); *Brack v. Evans,* 230 Md. 548, 187 A.2d 880 (1963). *See generally* Note, *supra,* 35 Md.L.Rev. at 663–64.

Despite the absence of any contractual privity between the parties, the Court in *Virginia Dare* allowed a plaintiff to recover in negligence for the personal injury he suffered as a result of relying upon the defendant's misrepresentations. The Court observed:

"[T]he weight of authority ... seems to be that such action is not necessarily confined to injuries arising out of contractual relations; that the action lies for negligent words, recovery being permitted when one relies on statements of another, negligently volunteering an erroneous opinion intending that it be acted upon and knowing that loss or injury are likely to follow if it is acted upon."

175 Md. at 291–92, 1 A.2d 897.

In formulating its holding, the *Virginia Dare* Court relied upon *Cunningham v. C.R. Pease Co.,* 74 N.H. 435, 69 A. 120 (1908), and *International Products Co. v. Erie Railroad Co.,* 244 N.Y. 331, 155 N.E. 662 (1927). Each of those cases permitted recovery for false statements in a cause of action grounded in negligence. *Martens Chevrolet v. Seney,* 292 Md. 328, 335, n. 5., 439 A.2d 534 (1982). *See also* Note, *supra,* 35 Md.L.Rev. at 661.

With respect to the relationship between the parties in cases of negligent misrepresentation, the Court of Appeals seems to have adopted the case law of New York. *See* Note, *supra,* 35 Md.L.Rev. at 667. To illustrate, the Court in *Holt v. Kolker,* 189 Md. 636, 57 A.2d 287 (1948), cited

with approval *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922). There, speaking for a majority of the New York Court of Appeals, Judge Cardozo said that a public weigher, hired by a seller to weigh beans, was liable in tort to a buyer for the weigher's negligent misrepresentation of the weight in a certificate he issued at the vendor's request. This was so, the Court declared, even though there was no privity of contract between the parties and the certificate was not made at the buyer's request. The plaintiff-buyer was allowed to recover because the defendant-weigher *knew* the plaintiff would act in reliance upon the false weight certificate. *See* Note, *supra,* 35 Md.L.Rev. at 667. Judge Cardozo reasoned that the "assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all those whose conduct was to be governed" by the weighing. *Glanzer,* 233 N.Y. at 239, 135 N.E. 275. Damages were allowed because "the bounds of duty are enlarged by knowledge of prospective use." *Id.* at 240, 135 N.E. 275. *Glanzer* stands for the proposition that a defendant's knowledge of the plaintiff's reliance on the statements made created a duty of care on the part of the utterer of the statements.

The *International Products* case cited by the Maryland Court of Appeals to buttress its *Virginia Dare* ruling followed *Glanzer* in allowing a plaintiff-owner of goods to recover, in negligence, for a warehouseman's false statements as to the location of the plaintiff's goods, thereby causing the goods to be uninsured when destroyed by fire. The evidence showed that the goods were not received by the defendant until after he had made the misstatements. Nevertheless, the court allowed the prospective carrier to recover for the negligent misrepresentation by the prospective bailor. Although no definite contract had been executed between the parties, any duty that might arise out of the "arrangement" was alleged by the defendant not to be owed by him until his receipt of the goods. The Court, in rejecting that assertion, stated:

"An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another.... But in a proper case we hold that words negligently spoken may justify the recovery of the proximate damages caused by faith in their accuracy."

244 N.Y. at 338, 155 N.E. 662. To be certain that *Glanzer* was not interpreted as a panacea for all misstatements of fact, the *International Products* Court delineated *Glanzer*'s bounds, stating:

"Not every casual response, not every idle word, however damaging the result, gives rise to a cause of action.... Liability in such cases arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, *the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care.*"

244 N.Y. at 337–38, 155 N.E. 662 (emphasis supplied).

■ Patently, the duty to furnish the correct information arises when the relationship is of the nature that one party has the right to rely upon the other for information. The precise degree of the relationship that must exist before recovery will be allowed is a question that defies generalization. *International Products*, 244 N.Y. at 338, 155 N.E. 662, put it best when it declared:

"[E]ach case must be decided on the peculiar facts presented. The same thing is true, however, in the usual action for personal injuries. There whether negligence exists depends upon the relations of the parties, the thing

done or neglected, its natural consequences, and many other considerations. No hard and fast line may be drawn."

According to *Prosser and Keeton on the Law of Torts,* § 107 (5th Ed.1984), 1988 Supp. at 105, the most common example of the duty to speak with reasonable care is based on a business or professional relationship, or one in which there is a pecuniary interest. *See also* Restatement (Second) of Torts, § 552 (1977). Although it has been suggested that one might reasonably expect "that courts will recognize other 'special relationships' and 'activities' that will justify the imposition of a duty to exercise reasonable care to avoid purely intangible economic loss," *Prosser,* § 107 at 746, we are not called upon in the matter *sub judice* to take cognizance of a "special relationship" not heretofore recognized.

■ The presence *vel non* of an oral or written contract is immaterial to the case at bar, inasmuch as the action is not bottomed on a contractual theory.

■ We think it clear that a "special relationship" existed between Giant, through its employees, and Epple by virtue of their communications that extended over a period of seven months. What occurred over that period of time amounted to a business relationship involving a prospective pecuniary interest on the part of both parties. Epple sought a buyer for his ice, and Giant sought a new supplier of ice just in case its own plant would not be ready in time for the next heat wave.[3] From the record, the jury could infer that, unknown to Epple, Ice King was considered by Giant to be a safety valve, a fallback position, just in case Giant's ice plant was not in operation.

According to Epple, the dialogue that took place between the parties represented much more than "unilateral attempts" on his part to invite a business relationship. It reflected an understanding whereby Epple was to become the supplier and Giant, the buyer, of ice. Though, initially,

---

3. Giant's plant was in full operation in June 1986.

the relationship was arguably tenuous, it ripened into a full-fledged business dealing as communications continued. Based on all the evidence adduced at trial, Epple had thirty to forty conversations with Hendricks during which the former requested guidance for the development of Ice King in order for it to conform to Giant's requirements. Epple testified that his conversations with Giant included:

1) the type, price, quality, and quantity of ice;

2) the delivery terms;

3) the location of Ice King's plant at a site most suitable to Giant;

4) the size of the storage facility needed to satisfy Giant's demand;

5) Giant's authorization of Epple's statement on a loan application that Giant was going to buy ice from Ice King;

6) Giant's assurances that everything was "all right" when Epple expressed his concern over hearing about Giant's plans to build its own ice plant;

7) arrangements for an inspection of Ice King's plant; and

8) the demand by Giant that Ice King supply further samples of ice and a certificate of insurance.

That evidence, if believed, indicates the presence of an "intimate nexus" akin to a contractual relationship or its "equivalent." *See Jacques v. First Nat'l Bank*, 307 Md. 527, 534–37, 515 A.2d 756 (1986).

Viewing the relationship of the parties in light of the duty to give the correct information, *see International Products, supra*, 244 N.Y. at 337–38, 155 N.E. 662, we are propelled to the conclusion that the evidence produced by Ice King, at the very least, raised a jury question as to whether appellants were under a duty to Epple.

Appellants *knew* that Epple was investing everything he owned into building the ice plant, believing that he had a commitment from Giant. In fact, Hendricks admitted on cross-examination that he was concerned about Epple's reliance and communicated that concern to his supervisor,

Knippen. Yet, when Epple's son spoke to Knippen and asked whether Ice King should seek other customers, Knippen responded in the negative. Moreover, before Epple obtained a loan from the bank, he sought reassurances from Hendricks as to whether there was a "deal" with Giant. Hendricks, Epple said, specifically assured him that "everything was all right." Hendricks indubitably knew that Epple was relying on those assurances, and he also knew, or should have known, that Giant had already chosen the site for its own plant and ordered the necessary equipment. Epple related to the jury that the pecuniary loss he sustained could have been avoided at that point in time, had Hendricks told him about Giant's plans to erect its own ice making plant.

That evidence, if believed, demonstrated that the relationship of the parties was one in which "in morals and good conscience" Epple had the right to rely upon Giant, and Giant owed a duty to give the correct information. *See International Products, supra,* 244 N.Y. at 338, 155 N.E. 662. *See also* Restatement (Second) of Torts, § 552.

We think the evidence was sufficient for the jury to find that appellants owed a duty to the appellees yet breached that duty.

### Justifiable Reliance

Appellants maintain that "the record is void of any evidence ... even remotely suggesting that Epple justifiably relied on statements made" to him by Giant or its employees.

■ The test for reasonable reliance was articulated by Judge Cardozo in *Glanzer.* There, for New York's highest tribunal, he wrote:

"We must view the act in its setting, which will include the implications and the promptings of usage and fair dealing. The casual response, made in mere friendliness or courtesy ... may not stand on the same plane, when we come to consider who is to assume the risk of negligence or error, as the deliberate certificate, indisputably an 'act in the law' ... intended to sway conduct."

233 N.Y. at 240–41, 135 N.E. 275. *See also* Note, 35 Md.L.Rev. at 667, 668.

▮ Epple, the evidence shows, had several discussions with the Giant employees who were in charge of purchasing ice. The information they gave to him amounted to more than "casual responses, made in mere friendliness or courtesy." It was not, as appellants submit, the " 'casual expressions of opinions' or statements of Appellants' future intentions or conduct."

Assuming *arguendo*, however, that when Epple took the initial steps to form his business, his reliance on appellants was unjustified, he, nevertheless, avoided major capital outlays until he had Giant's authorization to relate their "deal" to a bank's loan officer. Furthermore, although no written contract existed between the parties, a fact repeatedly stressed by appellants, the evidence strongly suggested that a "businessman in Epple's shoes" might have reasonably relied on the informal "deal" or "gentlemen's agreement" that is the custom of the trade. The evidence demonstrated that neither of Giant's previous ice suppliers had written contracts. It was clear that Giant's practice was *not* to issue written contracts. That a lending institution viewed the "deal" between Giant and Ice King as reliable underscores why it was reasonable for Epple to rely upon the information supplied by the appellants.

Significantly, Hendricks in May 1985 assured Epple that "everything was all right." We think that Epple was justified in relying upon that statement as an assertion of fact.

Appellee had just reminded Hendricks that, to establish Ice King, Epple had put up everything he owned based on his reliance on Giant's buying ice from him; Epple knew that Hendricks had spoken to the "higher ups" about the "deal"; Epple had already complied with Hendricks's request that he send a letter to the "higher ups"; and Epple had personally spoken to Knippen and told him that Hendricks had agreed to buy ice from Ice King. Believing that Hendricks was speaking for Giant, Epple justifiably relied

on Hendricks's assurances, understanding them to be more than "mere opinion." "When ... such reliance is regarded as reasonable and permissible, a misstatement of opinion may be a sufficient basis for relief." *Prosser and Keeton, supra,* § 109 at 755.

It is specious for appellants to argue that Epple was aware, or should have been on notice, that Giant was in the process of planning and building its own ice plant because that fact was widely known. The argument overlooks Epple's testimony that, in his conversation with Hendricks in May 1985, Epple indicated that he was shocked to hear about Giant's plans to build its own ice plant. Because he was unaware of those plans, he called Hendricks to ascertain the truth. It was incumbent upon Hendricks, knowing the consequences that his answer might entail for Epple, to advise Epple of the true facts. His assuring Epple that "everything was all right" was, at the very minimum, negligent.

We conclude, as did the judge and jury in the circuit court, that the evidence was sufficient to impose liability on the appellants for their negligent misrepresentation.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.