Frank TISCHLER, Plaintiff,

v.

BALTIMORE BANCORP, Harry L. Robinson, John C. Haigh, James H. Langmead, William A. Kroh, John I. Leahy, M. Peter Moser, George L. Russell, Jr., Eleanor K. Trowbridge, Charles T. Albert, L. Patrick Deering, George B. Hess, Jr., W. Clark McClelland, Theo C. Rodgers, Rodney G. Stieff, Robert F. Comstock, F. Barton Harvey, Jr., Richard P. Manekin, Martin L. Millspaugh, Thomas H. Sherlock and Alex. Brown & Sons, Inc., Defendants.

Civ. A. No. MJG-90-2927.

United States District Court
D. Maryland.

July 10, 1992.

Charles J. Piven, Baltimore, Md., and David A.P. Brower and David A. Isaac, Wolf Haldenstein Adler Freeman & Herz, New York City, for plaintiff.

John E. Sandbower, III, Phillips P. O'Shaughnessy and Alison D. Kohler, Sandbower, Gabler & O'Shaughnessy, Baltimore, Md., for defendants Robinson, Haigh and Langmead.

Wilbur D. Preston, Richard J. Magid, Jack L.B. Gohn and Howard R. Feldman, Whiteford, Taylor & Preston, Baltimore, Md., for defendants Kroh, Leahy, Moser, Russell, Trowbridge, Albert, Deering, Hess, McClelland, Rogers, Stieff, Comstock, Harvey, Manekin, Millspaugh and Sherlock.

George Beall, Stephen J. Immelt and Joseph H. Young, Hogan & Hartson, Baltimore, Md., for defendant Alex. Brown & Sons, Inc.

### MEMORANDUM DECISION

GARBIS, District Judge.

The Court has before it Motions to Dismiss Plaintiff's Amended Complaint filed by all Defendants other than Baltimore Bancorp ("the Bank") and the materials submitted by the parties relating thereto. The moving Defendants can be placed into three groups: Alex. Brown & Sons, Inc. ("Alex. Brown"), the Management Defendants,[1] and the Outside Directors.[2] The Court has held a hearing and has had the benefit of the arguments of counsel.

### I. FACTUAL BACKGROUND

For the purposes of this Memorandum Decision, the facts as alleged by Plaintiff can be summarized.[3] Prior to April 27, 1990, the Bank's common stock was selling between $11 and $12 per share.[4] On April 27, First Maryland Bank[5] announced that it would offer $17 per share subject to a review of the Bank's financial records and internal reports. The Bank's financial records, if subjected to a due diligence review by First Maryland, would have revealed a weaker financial condition than had been represented to the public through various false statements by the Bank.

The Bank engaged Alex. Brown to provide an opinion regarding the adequacy of the offer based upon a limited investigation. Alex. Brown, however, was given misleading and incomplete information (so that it had no reason to suspect that it was being misled). Alex. Brown reached the erroneous conclusion that the $17 per share offer was inadequate. At a May 16, 1990 board meeting, Alex. Brown gave its opinion to the Bank's Directors.

On May 16, 1990, the Bank unanimously rejected the First Maryland Bank offer as "inadequate" while in reality the reason for the rejection was the fact that the Bank and its directors did not want its financial records and internal reports to be reviewed, and the Directors wanted to protect their positions on the Bank's Board. The Bank's so-called reliance on Alex. Brown's opinion was subterfuge for its decision to reject First Maryland's offer out of hand, and in fact, the Directors determined to reject the offer before Alex. Brown's opinion was presented.

The Bank issued a general press release on May 16, 1991 which stated, among other things:

> In considering [the offer, the Bank's] board took into account the opinion of its financial advisor, Alex. Brown & Sons Incorporated, that the $17 per share was inadequate.

Shortly after the rejection, the stock price rose to approximately $15 per share. On May 29, First Maryland renewed its offer which the Bank rejected on May 31,

---

1. Harry L. Robinson, John C. Haigh, and James H. Langmead.

2. William A. Kroh, John I. Leahy, M. Peter Moser, George L. Russell, Jr., Eleanor K. Trowbridge, Charles T. Albert, L. Patrick Deering, George B. Hess, Jr., W. Clark McClelland, Theo C. Rodgers, Rodney G. Stieff, Robert F. Comstock, F. Barton Harvey, Jr., Richard P. Manekin, Martin L. Millspaugh, and Thomas H. Sherlock.

3. The Court recognizes that this summary is a superficial and by no means a comprehensive statement of Plaintiff's claims which are encompassed in his 138 page Amended Complaint.

4. The Bank's stock was, at all relevant times, traded on the New York Stock Exchange.

5. A subsidiary of Allied Irish Bank.

again stating its reliance upon valuation advice from Alex. Brown. Thereafter, First Maryland kept its bid open and the stock continued to trade in the $14 and $15 per share range for a short time but slowly dropped downward thereafter.

These actions by the Bank, its Directors and Alex. Brown, misled the public into believing that the Bank's stock was worth more than $17 per share. On November 1, 1990, First Maryland withdrew its offer and, on that date, the stock closed at a price of $5⅛ per share.

On November 8, 1990, Plaintiff Frank Tischler (as prospective representative of the class of persons who purchased the Bank's stock between May 16, 1990 and November 1, 1990) filed an original Complaint against the above referenced Defendants alleging various securities violations. All the Defendants moved to dismiss.

By Memorandum and Order issued April 29, 1991, the Court denied dismissal to the Bank and granted dismissal (without prejudice) to all other Defendants. In that decision, the Court held that the Plaintiff had adequately pleaded a cause of action of securities fraud against the Bank but had failed adequately to plead a case implicating the other Defendants in the Bank's allegedly wrongful acts.

On August 7, 1991, the Court certified Plaintiff's claims against the Bank as a class action on behalf of all persons and entities who purchased or otherwise acquired Baltimore Bancorp common stock between May 16, 1990 and November 1, 1990, but excluding from the class all Defendants, the affiliates of any Defendants and members of the immediate families of any Defendant ("the Purchaser Class").

By Order issued August 15, 1991, Plaintiff was granted leave to file an Amended Complaint which Plaintiff filed on November 5, 1991, naming the same Defendants. As relevant to the discussion in this Memo-

randum Decision, the Amended Complaint alleges, and the moving Defendants seek to dismiss, the following: [6]

Count II Violations of Section 10(b) of the Exchange Act and Rule 10b–5 by the Director Defendants

Count III Violations of Section 20 of the Exchange Act against the Director Defendants

Count IV Violations of Section 10(b) and Rule 10b–5 as an aider and abettor of the Section 10(b) violations by the Bank and the Director Defendants against Alex. Brown

Count V Negligent misrepresentation against the Bank and the Director Defendants

## II. PROCEDURAL ISSUES

### A. Further Procedural Background

It was anticipated by all concerned that Plaintiff would be seeking to file an Amended Complaint alleging liability on the part of the dismissed Defendants. By Order issued August 15, 1991, Plaintiff was granted leave (by October 8, 1991) to file an Amended Complaint asserting additional claims and adding Defendants. The Order further provided that "absent a strong showing of good cause, Plaintiff may not after October 8, 1991 add any Defendant in this case not sued in an Amended Complaint filed by that date." Accordingly, on August 15, 1991, Plaintiff had a deadline to file the Amended Complaint and would not, absent good cause, be allowed to add any new Defendant thereafter.

By virtue of a change in control of the Bank, on September 24, 1991, the Court approved the withdrawal of Whiteford, Taylor & Preston as counsel for the Bank and its replacement by Irwin, Kerr, Green, McDonald & Dexter. Because the Irwin firm had been brought in by a new control group, it would not have been appropriate

---

**6.** Count I alleges violations of Section 10(b) of the Exchange Act and Rule 10b–5 by the Bank. This Count of the Amended Complaint is not a subject of the pending motions as the Court has already ruled that Plaintiff states a viable claim against the Bank.

The Amended Complaint also includes Count VI (breach of fiduciary duty) and Count VII (tortious interference with prospective economic gain). These are not discussed herein.

for them to represent the individual defendants who were essentially the ousted former control group. Therefore, a Stipulation signed by counsel for Plaintiff and the Irwin firm as counsel for the Bank was approved by the Court extending the October 8, 1991 deadline for filing the Amended Complaint until November 4, 1991 to (among other things) "enable defense counsel to advise prospective individual defendants to obtain independent counsel." The Court thereafter extended the time to November 5, 1991.

On November 5, 1991 the Plaintiff filed the subject Amended Complaint.[7]

### B. Limitations Defenses

The moving Defendants assert that Plaintiff's securities claims in the Amended Complaint are barred by limitations. In essence they claim that the applicable one year limitations period[8] was triggered on November 1, 1990[9] and that limitations had expired by the time the Amended Complaint was filed. That is, the Defendants contend that the Amended Complaint, filed on November 5, 1991 was four days late. Plaintiff offers several bases for the Court to conclude that the Amended Complaint is not barred by limitations. As explained below, the Court need only address one.

### Relation Back

■ Rule 15(c)(2) of the Federal Rules of Civil Procedure provides:

An amendment of a pleading relates back to the date of the original pleading when the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth

or attempted to be set forth in the original pleading.

The purpose of Rule 15(c) is to provide the opportunity for a claim to be tried on its merits, rather than being dismissed on procedural technicalities, when the policy behind the statute of limitations has been addressed. *Siegel v. Converters Transp. Inc.,* 714 F.2d 213, 215 (2nd Cir.1983). The Fourth Circuit describes the application of Rule 15(c)(2) as a two-pronged analysis:

First, to relate back there must be a factual nexus between the amendment and the original complaint. Second, if there is some factual nexus an amended claim is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment.

*Grattan v. Burnett,* 710 F.2d 160, 163 (4th Cir.1983) (citations omitted), *aff'd.* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984).

■ In this case, there is no doubt that the Amended Complaint is premised upon the same "conduct, transaction, or occurrence" as alleged in the original Complaint. Moreover, the Defendants admit that they were fully on notice, at all relevant times, of the Plaintiff's intention to file an amended complaint making more specific the allegations in the original Complaint. Additionally, they acknowledge they would not be prejudiced (other than by failing to get the windfall benefit of a technical defense) by allowing the Amended Complaint to relate back to the original filing date.

Defendants contend that Rule 15(c) is not applicable because the April 29, 1991 Order dismissing the Complaint against them without prejudice did not expressly state that the Plaintiff had leave to amend.

---

7. In order to meet the November 5, 1991 deadline and also comply with a Protective Order preventing disclosure of certain information, Plaintiff (with agreement of the Bank) filed the Amended Complaint under seal. On November 13, 1991, a hearing was conducted where the Court found no reason for the Amended Complaint to be filed under seal. Accordingly, the Court ordered unsealing by the substitution of a new first page (eliminating the reference to sealing) which was accomplished on November 14, 1991. Hence, the substituted first page is stamped by the Clerk as filed on November 14, 1991. However, the Amended Complaint was,

in fact, filed November 5, 1991 and, as stated in the Court's Order of November 13, 1991, is "deemed to have been timely filed."

8. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991).

9. The date the cause of action allegedly accrued. Defendants cannot rely on the filing date of the original claim because, contrary to their assertion, the Amended Complaint was filed November 5 and not November 14, 1991.

Rather, that Order stated that Plaintiff could *seek leave* to file an amended complaint. Thus, Defendants assert the technical argument that, because the Court did not specifically state at the time of dismissal that leave to amend was granted, the original Complaint is "canceled" (as if it had never been filed) so that relation back is improper. The Court finds this position to lack merit or sense.

The Court does not find the absence of express language in the April 29, 1991 Order to be conclusive. This Court certainly intended, by its first decision, to allow the Plaintiff to file an amended complaint which would relate back to the original filing date so long as the amended complaint adequately pleaded a cause of action. In any event, on August 15, 1991 (well within the period of limitations), the Court expressly granted the Plaintiff leave to file an amended complaint with a specified time limit which was met.

In view of the foregoing, the Court need not address the Plaintiff's arguments regarding tolling and other bases upon which the limitation defense fails.

## III. SUBSTANTIVE ISSUES

The Court has previously found that the Plaintiff's allegations were sufficient to allege a case of securities fraud against the Bank. Here, the question is whether the Plaintiff has, in his Amended Complaint, adequately alleged that other Defendants should be liable for the "established" wrongdoing of the Bank.

■ When evaluating a motion to dismiss, the complaint must be construed in a light most favorable to the plaintiff and well-pleaded allegations must be accepted as true. 5A Wright & Miller, Federal Practice and Procedure § 1357, at 304 (1990). Moreover, the Court should not grant dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). However, a Complaint must state "the circumstances constituting [an alleged] fraud ... with particularity." Fed.R.Civ.P. 9(b).

### A. Alex. Brown

Plaintiff is very careful to avoid alleging any fault on the part of Alex. Brown in regard to its opinion. There is good reason for this. A perfectly pure Alex. Brown is an essential ingredient of the scenario that the Plaintiff wishes to paint. That is, one in which no other Defendant can defend based upon reliance on Alex. Brown.

The Plaintiff's scenario is one in which the Bank (through the individual Defendants) deliberately misled Alex. Brown by providing misleading and incomplete financial information to use in rendering its opinion. Moreover, there was nothing seen in the course of Alex. Brown's work which would reasonably have put it on notice that the information which was reviewed was unreliable. In short, the Plaintiff alleges, and needs, an Alex. Brown that was neither fraudulent nor negligent in rendering its opinion that the $17 per share offer was inadequate. Thus, the only reason for Alex. Brown's erroneous opinion was the Bank's (and any individual Defendants Plaintiff can blame) deception of Alex. Brown.

If a pure, diligent, but misled Alex. Brown is what Plaintiff alleges, then a pure, diligent, but misled Alex. Brown he will have. Hence, the sum and substance of the claim of Alex. Brown's aiding and abetting the doers of evil deeds, lies in its reaction (or lack thereof) to the May 16, 1990 press release. As pertinent hereto, that press release stated:

> In considering [the offer, the Bank's] board took into account the opinion of its financial advisor, Alex. Brown & Sons Incorporated, that the $17 per share was inadequate.

Plaintiff asserts that Alex. Brown, knowing that it had given a highly qualified opinion which was not to be made public by the Bank[10] should have, at that point, real-

---

**10.** The engagement letter in which Alex. Brown agreed to review the offer explicitly prohibited the Bank from revealing Alex. Brown's opinion to the public.

ized that it was participating in a fraud on the public. Hence, on Plaintiff's theory, at that point Alex. Brown became an aider and abetter by not making a public statement regarding the qualifications that it put on its opinion.

■ The elements of aider and abetter liability are (1) the presence of an underlying violation; (2) the aider's lending "substantial assistance" to the violation, and (3) the aider's knowledge of, or reckless disregard of the possibility of, the primary violation (i.e., scienter). *Martin v. Pepsi–Cola Bottling Co.*, 639 F.Supp. 931, 934 (D.Md. 1986). The thrust of Alex. Brown's argument for dismissal is that the third element—knowledge or reckless disregard—is not met.

Alex. Brown's first line of defense is fairly straightforward—it was unaware of the fraudulent scheme alleged as the principal violation. Indeed, Alex. Brown itself was a victim of the scheme because as a result thereof, without knowledge or negligence on its part, its name was attached to an erroneous opinion. Hence, it is argued, no one can be an aider and abettor of a scheme which it did not know existed even if its activities were utilized by the principal wrongdoers in furtherance of the scheme.

The Court need not accept this somewhat absolutist defense. There may be circumstances in which a party that innocently provides an opinion used in a fraudulent scheme might later be found to have joined the scheme. The question is whether that circumstance could have existed here.

■ Giving the Plaintiff the benefit of all reasonable inferences, can it rationally be concluded that Alex. Brown became aware of a fraudulent scheme when it read the press release? After all, what did the press release say insofar as Alex. Brown was concerned? Literally, there was nothing false in the statement. The only thing "wrong" was the mentioning of Alex. Brown's opinion.[11] As far as Alex. Brown

knew, the Bank's board did "take into account" its opinion that the offer was inadequate. Alex. Brown certainly believed that its opinion was correct.

The only alleged falsity about the statement is that by referring to an opinion of Alex. Brown, the release did not make clear that the opinion was not based upon an in-depth review of the Bank's records. However, the words "took into account" would communicate to any reasonable reader that the Alex. Brown opinion was considered, but not given conclusive weight. The press release did not state that the Bank had *relied upon* the opinion which might indicate that it was treated as a definitive statement. The use of the words "took into account" was perfectly consistent with the treatment to be afforded something less than a definitive opinion, and unlikely to set off bells to Alex. Brown of a fraudulent scheme.

Here, the most that any reasonable fact finder could conclude would be that Alex. Brown might think that the press release puffed the scope of work done by Alex. Brown in giving its opinion. Alex. Brown reasonably believed that the substance of its opinion was valid. In context, this Court does not find it rational that a fact finder would find on a preponderance standard, much less on a clear and convincing standard which might be pertinent, that Alex. Brown perceived that the Bank was making a false statement about the value of its stock with the intent to deceive the public.

Even assuming that Alex. Brown should have read the press release to constitute a false statement of the weight of its opinion, what scheme is it that Alex. Brown could rationally be held to have discovered? Alex. Brown had examined the records made available to it, had formed a good faith belief in its opinion, and had seen nothing to indicate that its opinion was unreliable or required further verification. Thus, there was nothing to indicate that

---

11. Whether Alex. Brown has a possible remedy for the Bank's violation of the agreement not to make the opinion public is not before the Court. However, it is not reasonable to conclude that

this violation triggered a duty on Alex. Brown to "go public" with a complaint against the Bank for disclosing the opinion.

there was any scheme to overstate the value of the Bank's stock. At most, the "scheme" would have been to overstate the weight of the Alex. Brown opinion in order to make it look as if the Board had done a more thorough job than it had done.

Furthermore, the Court cannot overlook the total absence of any allegation of a plausible motive for Alex. Brown to have knowingly aided and abetted the Bank's fraudulent scheme. There is no allegation that the fee was other than normal for the work done. There is nothing to indicate future consideration which would even arguably constitute some motive to engage in such a scheme. Nor does this Court find that the existence of a single common director on Alex. Brown's and the Bank's board provides any plausible basis to find an evil motive. While not conclusive, the absence of any rational motive to aid and abet a fraud is a factor supporting the Court's view that Alex. Brown should not be retained as a Defendant.

The Court is aware of the balancing necessary in evaluating the Amended Complaint in light of the pending motion to dismiss. The Court does not wish to deprive the Plaintiff of the opportunity, through discovery, to flesh out colorable allegations of wrongful conduct. On the other hand, a Defendant is seriously harmed by the mere pendency of a claim of improper conduct of the type alleged here. The cost, in a monetary, emotional and reputational sense of defending against a meritless claim of fraud, can be substantial.

In sum, the Court cannot find that "in the light most favorable to Plaintiff, and with every doubt resolved in his behalf, the complaint states any valid claim for relief." 5A Wright & Miller, Federal Practice and Procedure § 1357, at 321–36 (1990). Accordingly, the Court will grant Alex. Brown's motion for dismissal.

### B. The Management Defendants

■ Defendants Robinson, Haigh and Langmead were part of the management of the Board. Robinson was the Chairman of the Board, Chief Executive Officer and Chairman of the Executive Committee for the Bank. Haigh was the President, Chief Operating Officer and a director of the Bank. Langmead was Vice President, Controller and Chief Financial Officer of the Bank. Assuming (as it must) for purposes of this motion, that Plaintiff can establish what it alleges the Bank did, the Court must conclude, after careful examination of the Amended Complaint, that there have been adequate allegations against the Management Defendants.

Mr. Robinson is alleged to have done or directed substantially everything connected with the scheme in issue. Messrs. Haigh and Langmead are alleged to have participated personally in the scheme. The fact that Mr. Langmead was not a director does not shield him from liability if he aided and abetted the Bank's wrongdoing. The Plaintiff has sufficiently alleged personal involvement in fraudulent activities for each of the Management Defendants.

Plaintiff has also sufficiently pled scienter as to the Management Defendants. Plaintiff alleges substantial pecuniary motives as to the Management Defendants.

### C. The Outside Directors

The term "outside director" is used to refer to directors who were not part of management. Four of the outside directors were members of the Audit Committee.[12] Every outside director attended the May 16, 1990 board meeting, voted to reject the offer, and allowed the Bank to make representations which had the effect of misleading the public as to the value of the Bank's shares.

#### 1. Culpable Conduct

To satisfy Rule 9(b) on a claim of secondary liability, Plaintiff must plead with particularity "each defendant outside director's authority to participate in or effect the type of primary violation alleged, and that director's culpable conduct on the specific occasion in question." *Walker v. Cardinal Savings and Loan Ass'n,* 690

---

12. Theo C. Rodgers, William A. Kroh, John I. Leahy, and Thomas H. Sherlock.

F.Supp. 494, 501 (E.D.Va.1988).[13] Plaintiff contends that the outside directors can be found culpable because they personally (either intentionally or recklessly) agreed to represent to the public that their rejection of the offer was based on its inadequacy while knowing that in fact it was not inadequate, and/or that the decision to reject was based on inaccurate, if not false, information. According to Plaintiff, the Board's deliberations concerning the offer were a charade to lend credibility to their improper decision to reject the offer.

The outside directors fall into three categories, to be discussed separately:

1. The Audit Committee
2. The Alleged "Experts"
3. The Others

### a. Audit Committee Members

■ An independent audit committee, comprised of outside directors, ordinarily recommends the independent auditors to be employed, reviews the intended scope of the independent audit, and reviews and discusses the results of the audit. William E. Knepper, *Liability of Corporate Officers and Directors* § 1.11, at 26–27 (3rd Ed. 1978). The Audit Committee's reports to the board of directors "should include such matters as its findings and conclusions as to the corporation's financial statements, its accounting and financial policies, evaluation of its system of internal control, the internal audit, and selection and changes in auditors." *Id.* § 13.05, at 385.

Specifically, Plaintiff alleges the functions of the Bank's Audit Committee were as follows:

> The functions of the Audit Committee are to meet with the Company's internal auditor and independent accountants to review and determine whether satisfactory accounting procedures are being followed by the Company and whether internal accounting controls are adequate, as well as to inform itself with regard to non-audit services performed by the independent accountants. The Audit Committee also recommends to the Board of Directors the selection of independent accountants.

Amended Complaint ¶ 53. According to Plaintiff, "Defendants Kroh, Rodgers, Leahy and Sherlock ... had overall responsibility for supervising the management of Bancorp and verifying the assets, collateral, loan values and determination of appropriate loan-loss reserves and write-downs of non-performing loans and assets." *Id.*

The Court finds that Plaintiff sufficiently alleges culpable conduct as to these Defendants as members of the Audit Committee. Given their level of knowledge of the Bank's financial status, it was their role to question the information being presented to them which Plaintiff alleges did not jive with the information as necessarily known to them. *See* Louis Braiotta Jr., *Preventing Fraudulent Reporting; Auditing for Honesty*, A.B.A. J., May 1992, at 76, 79. Under Plaintiff's allegations, they purposely pursued the representation to the public that the offer was rejected as inadequate, knowing it was not. Thus, Plaintiff has sufficiently alleged that the audit committee directors acted to cause and/or permit the issuance of false and misleading statements.

### b. The "Expert" Directors

■ Plaintiff alleges that ten of the outside directors[14] had such special knowledge of the investment, banking, real estate and/or insurance businesses that they knew, or should have known, of the general decline of the banking industry and the real estate market and its obvious effect on the present and future prospects of the Bank. Because of this "expert" knowledge, according to Plaintiff, these defendants knew, or should have known, that the information being presented to them at the May 16 meeting was suspect, but that they "rubber-stamped" the position that the of-

---

**13.** There is no real dispute that Plaintiff has adequately pled the Outside Directors' authority to "participate in or effect" the Bank's fraud.

**14.** Charles T. Albert, L. Patrick Deering, W. Clark McClelland, Robert F. Comstock, Richard P. Manekin, M. Peter Moser, George L. Russell, Jr., Eleanor K. Trowbridge, F. Barton Harvey, Jr., and Martin L. Millspaugh.

fer was inadequate and acted to cause and/or permit that position to be represented to the public.

Taking Plaintiff's allegations totally at face value, and giving Plaintiff every possible inference, at this stage the Court cannot say that Plaintiff has not sufficiently alleged culpable conduct as to the "expert" Defendants. If these Defendants did know that the information being presented to them could not be accurate given the state of the local banking and real estate industries, and yet continued with the exercise of representing that the First Maryland offer of $17 per share was inadequate, the Plaintiff might well have a viable claim. However, the matter is hardly free from doubt. The Court will carefully examine the summary judgment motion these Defendants will doubtlessly file to determine whether Plaintiff's allegations are sufficiently supported by evidence to permit the action to continue against them.

### c. The "Others"

 The remaining Outside Directors, George B. Hess, Jr. and Rodney G. Stieff, are not alleged to have the same type of "inside" knowledge of financial information as the directors who sat on the Audit Committee.[15] Nor does Plaintiff allege that these two Directors had any particular knowledge of the Bank's financial position, or of the banking industry in general for these two directors. On Plaintiff's version of the facts, on May 16, 1990 Hess and Stieff received their information regarding the offer from the Management Directors, Alex. Brown's opinion, and financial information which they did not have a basis to know was inaccurate, inadequate and/or unreliable. Thus, even on Plaintiff's version of the facts, these two directors did no more, and no less, than rely upon informa-

tion they had no reason to doubt. Plaintiff simply does not allege that these two directors had any special background in banking or the financial market which they would bring to bear to decide that they should, in some way, question the information being presented to them.

Plaintiff would "nit pick" at the questions asked of Alex. Brown at the May 16 meeting and speculate that these two directors (who it is not alleged should even have suspected any fraudulent scheme) should have rejected the opinion of Alex. Brown and the recommendation of management. The Court is mindful, however, that outside directors are not required to place themselves in an adversarial position toward management or to assume without proof, or at least suspicion, that management is not dealing in good faith. Knepper, § 1.11, at 26.

Thus, giving Plaintiff every possible inference, the Court cannot find that Plaintiff has adequately pleaded a case against these two directors. Accordingly, they will be dismissed.

### 2. Scienter

#### a. Motive

 Plaintiff must adequately plead scienter.[16] Rule 9(b) does not require a plaintiff to allege facts that show motive for committing fraud. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2nd Cir.1989). Such allegations, however, may establish an acceptable inference of scienter. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2nd Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2nd Cir.1989).

 Plaintiff has alleged that most of the Outside Directors[17] received personal benefits by virtue of their position on the

---

**15.** Arguably, the very existence of the Audit Committee might provide further support to the remaining Outside Director's claim that even if they were not justified in relying upon management, they certainly could rely on the Audit Committee to warn them if reliance upon management was not warranted.

**16.** The Court notes that Defendants' knowledge and intent to defraud does not have to be al-

leged with the same particularity as other elements of fraud under Rule 9(b). *T. Rowe Price New Horizons Fund, Inc. v. Preletz*, 749 F.Supp. 705, 710 (D.Md.1990).

**17.** Except for Theo C. Rodgers, William A. Kroh, John I. Leahy, Rodney G. Stieff, Eleanor K. Trowbridge, and Martin L. Millspaugh.

Board. These benefits included such things as obtaining legal business for law firms and a source of financing for various ventures. There is not, however, any allegation of any improper or irregular benefit. In short, most of the Outside Directors had what might be considered the "normal" perquisites of office, including a possible inside track for the Bank's legal business and possibly friendly consideration of loan applications for borrowers they favor.

As to the Outside Directors who received these special perquisites, Plaintiff alleges the motive of "entrenchment," i.e., the Defendants' desire to continue to receive these perquisites, as raising an inference of scienter. *Nicholas v. Poughkeepsie Savings Bank/FBD*, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,606, at 97,841 (S.D.N.Y. Sept. 26, 1990); *In re Pfizer, Inc. Securities Litigation*, [1990–1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,710, at 98,350–51 (S.D.N.Y. Dec. 21, 1990).

While the Plaintiff has alleged nothing evil *per se* about the perquisites of office as to these Outside Directors, the Court finds that the Plaintiff has alleged facts from which it would be reasonable to infer that there could be a motive for the directors to remain on the Board.

#### b. Conscious Behavior

A Plaintiff can also satisfy Rule 9(b) "if he adequately identifies circumstances indicating conscious behavior by the Defendants" giving rise to a reasonable inference of scienter. *Cosmas*, 886 F.2d at 13. Plaintiff alleges that the circumstances surrounding the rejection of First Maryland's offer create an inference that Defendants did not reject the offer because it was inadequate, but rather for other (improper) purposes. Plaintiff alleges that the rejection was a *fait accompli* before Alex. Brown's presentation and the board meeting at which the rejection purportedly took place. Plaintiff further alleges post-rejection false statements concealing the true financial condition of the Bank. *See In re Ramada Inns Securities Litigation*, 550 F.Supp. 1127, 1132 (D.Del.1982) (conceal-

ment may give rise to inference of scienter). Plaintiff also adds, on the "scienter scale," the same allegations made to support the claim of culpable conduct.

The Court concludes, on the very pro-Plaintiff standard applicable to a motion to dismiss, that these circumstances sufficiently support an inference of scienter.

### D. Negligent Misrepresentation

 The individual Defendants maintain that there exists no duty between them, as the Bank's directors, and Plaintiff/shareholder, as would be required to satisfactorily allege the state law claim of negligent misrepresentation. The elements of the tort of negligent misrepresentation are:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 791 (1988) (quoting *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534, 539 (1982)).

The individual Defendants argue that an "intimate nexus" is required between them and the Plaintiff/shareholder in order for the duty element to be met, which is lacking here. Plaintiff contends that the Maryland courts have rejected such a limitation and that duty rests on whether the utterer of the statement knew the statement would be relied upon. Moreover, Plaintiff contends that in any case, a sufficient nexus exists between the Defendants and Plaintiff.

The Court's analysis begins with a brief review of Maryland case law on the subject. Negligent misrepresentation was

first recognized as a cause of action in Maryland in *Virginia Dare Stores, Inc. v. Schuman*, 175 Md. 287, 1 A.2d 897, 899 (1938). Although duty was not explicitly required as an element of the tort in that case, the Court of Appeals said there that defendant "owed him some duty." *Id.* Ten years later, in *Holt v. Kolker*, 189 Md. 636, 57 A.2d 287 (1948), the Court of Appeals explicitly recognized duty as an element of the tort, stating that "there must be such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with care." 57 A.2d at 288.

In *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 515 A.2d 756 (1986), the Court of Appeals distinguished economic injury and personal injury, requiring a showing of a direct relationship when only economic injury is alleged.[18] The Maryland Court of Appeals stated:

> Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of liability. *This intimate nexus is satisfied by contractual privity or its equivalent.*[19]

*Id.* 515 A.2d at 759–60 (emphasis added) (footnote omitted). The court reached this holding by reviewing and adopting the analysis of two seminal cases from the New York Court of Appeals which considered duty where only economic loss was alleged.

In *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 279 (1922), Judge Cardozo held that a public weigher of beans was liable to the buyer of beans for negligence in the weighing, regardless of the fact that the weigher was hired and paid by the seller. Because the buyer was the known and intended beneficiary of the contract between the seller and the weigher, the Court found that a duty existed.

In contrast, in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), the Court of Appeals found that public accountants who carelessly prepared and certified a balance sheet for a corporation was not liable to a factor who made loans to the corporation in reliance upon the balance sheet. This was so even though the accountants were on notice that the balance sheet would be relied upon by others. The Court held that "there was [no] contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants ... to the indeterminate class of persons who ... might deal with the [corporation] in reliance on the audit." *Id.* 174 N.E. at 446.

In its more recent holdings, the Maryland Court of Appeals continues to recognize the requirement of contractual privity or its equivalent when only economic loss is alleged. In *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 793–94 (1988), the court held that face-to-face interaction created the type of relationship which was the "equivalent" of contractual privity. "[T]he ... precontractual [business] discussions between Weisman and Connors more closely resemble the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship." *Id.* 540 A.2d at 793. Similarly, in *Giant Food v. Ice King, Inc.*, 74 Md.App. 183, 536 A.2d 1182 *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988), the court found that a business relationship that extended over a period of seven months created the type of "special relationship" that "indicates the presence of an 'intimate nexus' akin to a contractual relationship or its 'equivalent.'" *Id.* 536 A.2d at 1185.[20]

---

**18.** *Jacques* did not involve a negligent misrepresentation claim. However, the case explains when a tort duty will be recognized.

**19.** The Maryland Court of Appeals also noted, in contrast, that "where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability." *Jacques*, 515

A.2d at 760 (citing *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916)).

**20.** Plaintiff asserts that the Court in *Giant Food* rejected the "contractual privity or its equivalent" standard in favor of the imposition of duty whenever a defendant knows of the plaintiff's reliance on the defendant's statements. The *Giant Food* Court clearly did not adopt such a standard, which was expressly rejected in *Ultra-*

Upon review of the case law, it becomes clear that Maryland's courts share the view of the New York Court of Appeals in requiring that, where only economic injury is alleged, a bond or intimate nexus must exist between the parties that equates to contractual privity. The United States District Court for the Southern District of New York applied this same standard to a directly analogous set of facts in *Brickman v. Tyco Toys, Inc.*, 722 F.Supp. 1054 (S.D.N.Y.1989).

In *Brickman*, a shareholder brought a class action against the Tyco Toys corporation and its directors alleging, among other things, negligent misrepresentation for misrepresentations made in a corporate press release. Defendants moved to have the negligent misrepresentation count dismissed because of a lack of duty.

The court began its analysis by recognizing that New York law will find duty only where " 'the plaintiff's intended reliance, on the information *directly transmitted* by the [defendant,] create[s] a bond so closely approaching privity that it [is], in practical effect, virtually indistinguishable therefrom.' " *Id.* at 1062 (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 438, 483 N.E.2d 110, 113 (1985) (emphasis in the original) (citing *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922)). The *Brickman* court also recognized that such an "intimate nexus" cannot exist unless a defendant is aware of a specific party or class of parties which intend to rely upon the defendant's statement. 722 F.Supp. at 1062. The district court stated that "[b]oth of these requirements seek to address the courts' concern that liability not be extended to unknown or unforeseen third parties." *Id.* (citing *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931)).

The *Brickman* court held that the shareholder plaintiff failed to satisfy the duty requirement. First, the court found that the statement issued by the directors, in the form of a press release, was "far from

direct or personal." *Id.* Second, the court found that "plaintiff and the putative class are part of an infinite number of investors who *might* have chosen to invest in Tyco stock based on the Company's alleged misrepresentations." *Id.* (emphasis in original).

This Court finds that the *Brickman* court's analysis is on point, and persuasive. Here, as in *Brickman*, no direct relationship of any kind existed between the individual defendants and the Plaintiff/shareholder. The Directors communicated the alleged misrepresentations through the impersonal medium of a general press release. Moreover, as in *Brickman*, Plaintiff and the putative class here were merely part of the enormous, and indefinite, pool of all potential investors.

The most recent Maryland case analyzing duty under a negligent misrepresentation cause of action is *Village of Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 556 A.2d 1126 (1989), which Plaintiff suggests is controlling in his favor. In that case, the court found (in dicta) an intimate nexus between a company that developed, published and promoted a design for construction of exterior walls of buildings, and persons who read and relied on such publications, even though there had never been any face-to-face interaction between the parties. This is so because the court found that the persons receiving the publication were *not* a part of the "general universe." *Id.* 556 A.2d at 1134. The court stated:

> Although the group of persons who might be expected to rely upon information of this kind may be large, they *are identifiable*, particularly, if the group is limited to architects and structural engineers. A trier of fact could find that the architects and engineers are the very persons whom [the publisher] intended to act on the information supplied. We think it clear that in some circumstances it is the practice of the industry that architects and engineers depend upon

---

*mares Corp.* Rather, the Maryland Court of Special Appeals based its decision explicitly on its finding that a "special relationship" existed

between the parties which indicated an "intimate nexus."

technical information supplied by manufacturers.

*Id.* (emphasis added).

The facts in this case are materially distinguishable from the narrow circumstances in *Village of Cross Keys.*[21] In *Cross Keys*, the statements at issue were specifically directed to architects and engineers in a publication addressed to those specific professionals to influence them to use the Defendant's product in construction projects. Here, the statement issued through the press release was directed to the "general universe" of the public at large.[22] Moreover, because the statement in *Cross Keys* was targeted to a specific group of persons, the specific group of persons to whom the defendant owed a duty was ascertainable before the alleged injury took place. In this case, the statement was made to the general public, so that no specific group could be identified. Extending a duty to the Plaintiff and the putative class in this case would impose liability "in an indeterminate amount for an indeterminate time to an indeterminate class" which Maryland law strictly prohibits. *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783, 792 (1988) (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (1931)). *Accord Brickman*, 722 F.Supp. at 1062. Accordingly, Plaintiff's cause of action for negligent misrepresentation will be dismissed.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Frank Tischler's Amended Complaint shall be dismissed as to Defendant Alex. Brown & Sons, Inc. and Defendants George B. Hess, Jr. and Rodney G. Stieff for its failure to state a claim. Plaintiff has failed to

adequately plead that Alex. Brown had knowledge or reckless disregard of the underlying securities violation, as is necessary for aider and abettor liability, and has failed to plead culpable conduct on the part of Hess and Stieff. Also Plaintiff's claim of negligent misrepresentation shall be dismissed because of Plaintiff's failure to adequately plead the necessary element of duty.

---

**21.** The Maryland Court of Appeals was not creating a new broad approach in *Village of Cross Keys* for finding duty when only pecuniary loss is alleged. The court clearly stated that it continued to recognize the distinction between duty when physical harm is alleged, and duty when only economic loss is alleged. As the court stated: "liability for negligent misrepresentation is more restricted than that for fraudulent misrepresentation, and liability for negligent misrepresentation resulting only in pecuniary loss is more restricted than that for negligent mis-

representation resulting in physical harm." 556 A.2d at 1133.

**22.** The Directors' press release received wide dissemination to the general public. The Baltimore Sun, the Daily Record, and the Baltimore Business Journal, as well as the Washington Post and the Washington Times, all reported the Directors' statement that the offer was rejected for its inadequacy. The statement was also picked up by the United Press International.