PPM AMERICA, INC., et al., Plaintiffs,

v.

MARRIOTT CORPORATION,
et al., Defendants.

Civ. No. H–92–3068.

United States District Court,
D. Maryland.

April 22, 1993.

Lawrence Kill and Anderson, Kill, Olick & Oshinsky, New York City and Charles M. Kerr and Irwin, Kerr, Green, McDonald & Dexter, Baltimore, MD, for plaintiffs.

Arne M. Sorenson and Latham & Watkins, Washington, DC and Richard J. Magid and

Whiteford, Taylor and Preston, Baltimore, MD, for defendants.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, Senior District Judge.

Presently pending in this civil action is defendants' motion to dismiss or, in the alternative, for partial summary judgment. Defendants here seek dismissal of the first amended complaint filed by plaintiffs in *PPM America, Inc., et al. v. Marriott Corp., et al.*, No. H–92–3068.[1] The defendants in this action are Marriott Corporation, J. Willard Marriott, Jr., Richard E. Marriott, and Stephen F. Bollenbach. The plaintiffs are fifteen institutional investors which purchased Marriott bonds either at initial offerings or on the open market at various times between January 27, 1992 and October 2, 1992. The first amended complaint (hereinafter the "complaint") was filed in this civil action on December 4, 1992.

The complaint contains the following counts:

Count I, alleging a violation of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k;

Count II, alleging a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*;

Count III, alleging a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5;

Count IV, alleging common law fraud; and

Count V, alleging negligent misrepresentation.

In support of their pending motion, defendants contend that the complaint fails to plead fraud with particularity as required by

---

1. The motion to dismiss was originally directed at the complaint in all nine of the cases which at that time had been consolidated under the heading *United Apple Sales Incorporated Profit Sharing Trust, etc. v. Marriott Corporation, et al.*, Civil No. H–92–2858 (Consolidated). Eight of these actions were purportedly class actions, and a first amended consolidated complaint had been filed in the class action cases following consolidation. On March 11, 1993, the Court was informed that defendants and the class action plaintiffs had entered into an agreement in principle to settle the class action suits. By Order of March 16, 1993, the Court stayed proceedings in the eight consolidated class actions. By Order of April 6, 1993, the Court severed the *PPM America* action from the consolidated actions. Accordingly, the Court now considers the pending motion to dismiss only insofar as it relates to the first amended complaint filed in *PPM America, Inc., et al. v. Marriott Corp., et al.*, Civil No. H–92–3068.

Rule 9(b), F.R.Civ.P., and that therefore Counts I, II, III, and IV should be dismissed. In addition, defendants contend that Counts I and II fail to state proper claims under applicable federal securities law and that Counts IV and V fail to state proper claims under the common law of the State of Maryland.

Memoranda, exhibits and declarations in support of and in opposition to the pending motion have been filed by the parties and reviewed by the Court. A hearing on the motion has been held in open court. Since little discovery has been undertaken to date in this case, the pending motion will be treated solely as a motion to dismiss. For the reasons to be stated herein, defendants' motion to dismiss will be granted in part and denied in part.

I

### Allegations of the Complaint

The essential dispute in this case arises as a result of the alleged failure of defendants to disclose to plaintiffs, before their purchase of bonds of Marriott Corporation, the existence of a plan to divide Marriott Corporation into two separate corporate entities, Marriott International and Host Marriott Corporation (hereinafter the "Restructuring"). The complaint contains the following allegations of fact. The Restructuring was announced publicly on October 5, 1992. Pursuant to the Restructuring, Marriott International will own Marriott Corporation's management services businesses, while Host Marriott will own Marriott Corporation's real estate portfolio. Marriott International will account for over 50% of Marriott Corporation's cash flow, but will be responsible for only $20 million of its outstanding long-term debt. Host Marriott, on the other hand, will account for less than 50% of Marriott Corporation's cash flow, but will be responsible for $2.9 billion of its outstanding debt. It is alleged that Host Marriott's real estate portfolio will not generate sufficient cash flow to service its debt and other obligations.[2]

It is further alleged that the defendants commenced their planning of the Restructuring no later than January 1, 1992. According to the complaint, the intent of the Restructuring was to increase the value of the substantial equity interests of the individual defendants in defendant Marriott Corporation at the expense of its bondholders. Defendant Bollenbach, who allegedly has extensive experience in restructuring or "downsizing" corporations, was hired in February of 1992 for the purpose, *inter alia*, of implementing the Restructuring. At approximately the same time, defendant Marriott Corporation retained various professional entities to provide advice concerning the Restructuring.[3] The Restructuring was given the code name Project Chariot. Prior to the October 5, 1992 public announcement, at least one member of Marriott's Board of Directors, Professor Thomas R. Piper of the Harvard Business School, resigned because of his opposition to the Restructuring. According to the complaint, a number of the individual defendants and other Marriott employees made public statements after the October 5 public announcement indicating that the Restructuring had been the culmination of a long-standing strategy to separate Marriott's management businesses from its real estate ownership.

Before the October 5, 1992 public announcement, defendants allegedly made misleading disclosures. In April of 1992, Marriott Corporation had filed its Annual Report on Form 10–K with the Securities and Exchange Commission. The complaint identifies a number of specific statements within the 1992 Form 10–K which allegedly indicate that Marriott Corporation had a policy of limiting debt based upon cash flow from op-

**2.** The record currently before the Court does not indicate what effect, if any, the proposed settlement of the class action suits and proposed new restructuring will have on these alleged facts.

**3.** According to the complaint, these entities included James D. Wolfensohn & Co.; Latham &

Watkins; Merrill Lynch Pierce Fenner & Smith, Inc.; Houlihan Lokey Howard & Zukin Inc.; Arthur Andersen & Co.; Salomon Brothers, Inc.; Donaldson Lufkin & Jenrette, Inc.; Skadden Arps Slate Meagher & Flom; and Citicorp Securities Markets, Inc.

erations.[4] Each of the individual defendants signed the 1992 Form 10–K. On April 21, 1992, Marriott Corporation filed a Current Report on Form 8–K, which stated:

[W]e are continuing to work on reducing debt and extending maturities of long-term debt, in order to maximize our financial flexibility.

On April 22 and April 28, 1992, Marriott Corporation filed Registration Statements, including Prospectuses, for debt securities. The Prospectuses incorporated the Form 10–K and the Form 8–K statements. By supplements to these Prospectuses, Marriott Corporation offered $200 million principal amount of 10% notes, and $200 million principal amount of 9.5% notes. These supplements incorporated the prior Prospectuses.

In May of 1992, defendant Bollenbach, stated:

These financings [the offerings of the 9.5% and 10% Notes], coupled with asset sales expected to be completed by June 1992, will allow us to reduce our revolver bank borrowings to under $200 million.... We have substantially improved our debt maturity schedule through these actions and believe this adds greatly to the financial flexibility of the company.

Some time in May of 1992, Bollenbach further stated that Marriott Corporation was then in a position to repay all of its debt maturities in aggregate through the year 2000 from cash flow from operations.[5]

In sum, the complaint alleges two interrelated types of misrepresentations and omissions: first, that defendants failed to reveal their planned Restructuring to purchasers of bonds prior to the October 5, 1992 public announcement and second, that defendants affirmatively represented that the policy of Marriott Corporation was to balance its debt against its cash flow from operations.

4. The specific statements are identified in Paragraphs 28 and 29 of the complaint.

5. Whether or not the statements identified in the complaint were in fact misleading under the circumstances in which they were made is not an issue at this early stage of the case.

II

*Discussion*

(a)

*Failure to Plead Fraud with Particularity*

■ Defendants seek a dismissal of Counts I, II, III, and IV of the complaint on the ground that the allegations of fraud contained in the complaint lack the particularity required by Rule 9(b), F.R.Civ.P.[6] While the requirement of particularity does not require elucidation of every detail of the alleged fraud, Rule 9(b) "does require more than a bare assertion that such a cause of action exists." *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.,* 576 F.Supp. 312, 327 (D.Md.1983). Generally, the circumstances of the alleged fraud must be stated with particularity. *In re Jiffy Lube Securities Litigation,* 772 F.Supp. 258, 261 (D.Md.1991). These circumstances include "the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [was] obtained thereby." *Windsor Associates, Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (D.Md.1983) (quoting C. Wright and A. Miller, *Federal Practice and Procedure,* § 1297, at 400,403 (1969)). Rule 9(b) must be read in conjunction with Rule 8(a), which requires only a "short and plain statement of the claim," as well as with "the general policy embodied in the Federal Rules favoring simplicity and flexibility in pleading." *Id.* The central question which always arises when a complaint has been attacked under Rule 9(b) is how much detail is necessary to give adequate notice to the opposing party in order to enable that party to prepare adverse pleadings. *Id.*

■ After considering the parties' arguments, the Court concludes that the requirements of Rule 9(b) have been satisfied in this case. Plaintiffs have identified the time frame during which the alleged fraud took

6. The parties dispute whether the requirement of particularity applies to plaintiffs' claims asserted under § 11 and § 12(2). Specifically, the parties dispute whether or not plaintiffs must prove fraud in order to prevail on their claims under these sections. The Court need not, and does not, address this issue at this early stage of these proceedings.

place. They have also identified specific documents which contained allegedly fraudulent statements, as well as specific, allegedly fraudulent statements made by one or more of the individual defendants. In addition, plaintiffs have alleged other surrounding circumstances pertaining to the alleged fraud, including the hiring of Bollenbach, the retention of a large number of professional entities for the purpose of receiving advice, and the personal motives of the individual defendants. The plaintiffs have described the Restructuring in detail, have indicated the time frame during which the plaintiffs believe the Restructuring was planned, and have indicated how the various alleged misrepresentations and omissions were misleading.

Inferences derived from the hiring of Bollenbach in conjunction with the substantial personal stake of the Marriott family in the value of their Marriott stock satisfies the requirement that plaintiffs must plead circumstances giving rise to an inference of fraudulent intent. *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990). These alleged facts also distinguish this case from *Gollomp v. MNC Financial, Inc.,* 756 F.Supp. 228 (D.Md.1991), where the complaint was dismissed for failure to plead any facts at all from which an inference of fraud could be drawn. Indeed, the facts of this case are more closely aligned with those in *Hershey v. MNC Financial, Inc.,* 774 F.Supp. 367 (D.Md.1991), where a motion to dismiss filed under Rule 9(b) was denied as to a second series of complaints arising out of the same transaction which was at issue in *Gollomp.* In *Hershey,* Judge Motz of this Court determined that the plaintiffs had alleged facts from which a factfinder could infer that the alleged misrepresentations were made knowingly or recklessly. 774 F.Supp. at 374. Similarly, in this case, the complaint alleges sufficient facts to give rise to such an inference.

Accordingly, this Court concludes that defendants have been given adequate notice of the nature of the fraud being alleged, and that the requirements of Rule 9(b) have been satisfied by the allegations of the complaint in this case. Counts I, II, III and IV of the complaint are therefore not subject to dismissal because of plaintiffs' failure to comply with Rule 9(b).

### (b)

### *Availability of §§ 11 and 12(2) to Purchasers in the Open Market*

While a majority of the Marriott bonds held by plaintiffs were allegedly purchased at initial offerings, a substantial number were purchased in the open market.[7] At least three of the plaintiffs do not claim to hold any bonds purchased at initial offerings.[8] Defendants contend that in order to state a claim under §§ 11 and 12(2) of the Securities Act of 1933 (hereinafter the "1933 Act"), plaintiffs must allege that they purchased Marriott bonds at initial offerings. Plaintiffs in turn argue that holders of bonds purchased in the open market may, under the circumstances of this case, assert claims under these sections. The resolution of this dispute requires that this Court interpret various provisions of the 1933 Act. The issues raised have not as yet been finally resolved by either the Fourth Circuit or the Supreme Court.

### (i)

### *Section 11*

Section 11 of the 1933 Act, 15 U.S.C. § 77k provides in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security

---

7. Plaintiffs contend that, as a group, they own $86.75 million worth of bonds purchased at initial offerings, and $36.55 worth of bonds purchased in the open market. *See* Plaintiffs' Memorandum in Opposition at 5–6 (charts indicating amount of bonds held by each plaintiff, and stating whether the bonds were purchased at initial offerings or in the open market).

8. London Pacific Life & Annuity Company, Provident Mutual Life Insurance Company of Philadelphia, and Utica National Life Insurance Company.

... may [sue five specific categories of people].

Defendants contend that the complaint must be dismissed as to some of the plaintiffs in this case insofar as their § 11 claims are based upon securities purchased in the open market rather than at initial offerings.[9] In opposition, plaintiffs argue that § 11 does indeed apply to purchases made in the open market if the securities were initially issued pursuant to a misleading registration statement. Both sides have cited supporting authority.

In support of their position, defendants rely on three recent opinions of district courts. *Newman v. Comprehensive Care Corp.*, 794 F.Supp. 1513 (D.Or.1992); *In re Delmarva Secs. Litig.*, 794 F.Supp. 1293 (D.Del.1992); *Mullaly v. Wiles*, 93–109314, No. 91–M–731, 1991 WL 504866, 1991 U.S.Dist. LEXIS 19989 (D.Colo. Oct. 24, 1991). All three of these cases draw a general distinction between the 1933 Act and the Securities Exchange Act of 1934 (hereinafter the "1934 Act"). Reasoning that the purpose of the 1933 Act was to regulate initial distributions while the purpose of the 1934 Act was to regulate subsequent trading in the secondary market, these district courts have concluded that § 11 must apply only to initial distributions. Two of these cases, *In re Delmarva* and *Mullaly*, rely entirely on a Third Circuit opinion, *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), which held that § 12(2) was available only to holders of securities purchased at initial offerings.

■ Plaintiffs, on the other hand, have cited a number of other cases concluding that § 11 is available to the holder of any security which can be "traced" to the allegedly misleading registration statement. *Barnes v. Osofsky*, 373 F.2d 269 (2d Cir.1967) (Friendly, J.); *Klein v. Computer Devices, Inc.*, 591 F.Supp. 270 (S.D.N.Y.1984); *Guenther v. Cooper Life Sciences, Inc.*, 759 F.Supp. 1437 (N.D.Cal.1990); *In re Ramtek Secs. Litig.*,

[1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,483, 1990 WL 157391 (N.D.Cal. Sept. 7, 1990). A security is considered "traceable" to an allegedly misleading registration statement if the holder of the security can show that the security was issued pursuant to the registration statement. *E.g.*, *Klein*, 591 F.Supp. at 273. Plaintiffs' position is supported by Professor Loss, who is of the opinion that "[s]uit may be brought [pursuant to § 11] by any person who acquired a *registered* security, whether in the process of distribution or in the open market." Louis Loss & Joel Seligman, IX *Securities Regulation* 4249 (3d ed. 1992).

After reviewing the authorities cited, this Court agrees with the construction of § 11 urged by plaintiffs. Nothing in the language of § 11 limits the scope of the section to initial offerings. Indeed, "any person *acquiring* such security" (emphasis added) is permitted by the terms of § 11 to file suit. The security which forms the basis for a claim asserted under this Section must, however, have been issued pursuant to a misleading registration statement. The cases to the contrary cited by defendants are not persuasive. They all make a general distinction between the 1933 Act (initial distributions) and the 1934 Act (secondary trading) which, for reasons discussed at some length hereinbelow, is of dubious value.

For these reasons, this Court has concluded that plaintiffs have stated a claim under § 11 as to all bonds traceable to the allegedly misleading registration statements.

(ii)

*Section 12(2)*

■ Section 12(2) of the 1933 Act, 15 U.S.C. § 77*l*, provides in relevant part that:

Any person who ... offers or sells a security (whether or not exempted by the provisions of section 77c of this title [§ 3 of the 1933 Act] ...), ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact neces-

---

9. Count I of the complaint applies only to plaintiffs who purchased 9.5% and 10% notes, a total of $110.85 million in notes. Of this amount, $86.75 million worth of notes were allegedly purchased at initial offerings, while $24.1 million worth of notes were allegedly purchased in the open market.

sary in order to make the statements, in light of the circumstances under which they were made, not misleading ... and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him [for specified damages].

Once again, the parties dispute whether a holder who purchased bonds in the open market may assert a claim under this Section. Both parties again cite authority in support of their respective positions.

Defendants rely most heavily upon the Third Circuit decision in *Ballay*, 925 F.2d 682, and upon the opinion of Judge Hargrove of this Court in *T. Rowe Price New Horizons Fund, Inc. v. Preletz*, 749 F.Supp. 705 (D.Md. 1990), both of which concluded that § 12(2) did not apply to sales of securities in the open market. *See also, Hedden v. Marinelli*, 796 F.Supp. 432 (N.D.Cal.1992); *Bennett v. Bally Mfg. Corp.*, 785 F.Supp. 559 (D.S.C. 1992); Elliot J. Weiss, *The Courts Have it Right: Securities Act Section 12(2)· Applies Only to Public Offerings*, 48 Bus.Law. 1 (1992).

Plaintiffs urge that the Supreme Court's reasoning in *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979) should be applied to civil actions brought under § 12(2). In *Naftalin*, the Supreme Court held that § 17(a) of the 1933 Act applies to open market transactions. Plaintiffs argue that since § 12(2) is the civil analogue of § 17(a) and that since the trend in recent case law is to read § 12(2) broadly, this Court should apply in this case the principles enunciated by the Supreme Court in *Naftalin*. Plaintiffs further rely upon Professor Loss's detailed criticism of the *Ballay* opinion. Louis Loss, *The Assault on Securities Act Section 12(2)*, 105 Harv.L.Rev. 908 (1992); Louis Loss & Joel Seligman, IX *Securities Regulation* 4218 (3d ed. 1992). Professor Loss has cogently argued that the rationale of *Naftalin* should be extended to § 12(2), and that *Ballay* misinterpreted the language and purpose of the 1933 Act. At least one court has reached a similar conclusion and has held that § 12(2) applies to open

market transactions. *Farley v. Baird, Patrick & Co., Inc.*, 750 F.Supp. 1209, 1221 (S.D.N.Y.1990).

After due consideration of the conflicting authorities cited by the parties, this Court has concluded that § 12(2) does apply to open market transactions. The reasoning of *Ballay* is unpersuasive for several reasons. First, the Third Circuit in *Ballay* based its decision in part upon a general distinction between the 1933 Act (initial distributions) and the 1934 Act (secondary trading). 925 F.2d at 691. However, as pointed out by the Supreme Court in *Naftalin*, this distinction may be accurate as a general comparison of the two Acts, but it is simply not conclusive grounds for determining that any *particular* section of the 1933 Act is limited to initial distributions. 441 U.S. at 777–778, 99 S.Ct. at 2084. Second, the *Ballay* decision is based in part upon what the Third Circuit perceived to be the complimentary relationship between § 12(2) of the 1933 Act and § 10(b) of the 1934 Act. However, as Professor Loss has convincingly demonstrated, a comparison of these two sections is ahistorical and is not useful for interpreting the meaning of § 12(2). Loss, *The Assault on Securities Act Section 12(2)*, 105 Harv.L.Rev. at 915–916.

Aside from these general considerations which are of secondary importance, the language of the 1933 Act itself supports the Court's conclusion in this case. The class of persons potentially liable under § 12(2) are those who offer or sell a security "by means of a prospectus or oral communication." As was noted in *Ballay*, 925 F.2d at 688, it would be illogical for a seller to be liable for oral statements but not for written statements; therefore, it is the term "prospectus" which would potentially limit § 12(2) to initial offerings.

The term "prospectus" is defined by § 2(10) of the 1933 Act, 15 U.S.C. § 77b(10), as:

[A]ny prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security ...

This definition then delineates two specific situations in which a communication would not be considered a "prospectus," neither of which are directly relevant to the issue now before the Court in this case. The terms "offer" and "sale" clearly extend to open market transactions. § 2(3) of the 1933 Act, 15 U.S.C. § 77b(3); *Naftalin*, 441 U.S. at 778, 99 S.Ct. at 2084. Thus, the § 2(10) definition of "prospectus," considered alone, may reasonably be interpreted as applying to written communications made in connection with any offer or confirmation of the sale of any security, without regard to whether the security is being offered or sold as part of an initial distribution or on the open market.

Confusion arises because § 10 of the 1933 Act, 15 U.S.C. § 77j, purports to dictate the contents of a "prospectus." This led the Third Circuit in *Ballay*, 925 F.2d at 688, to conclude that the term "prospectus" must generally refer to communications subject to the requirements of § 10. However, for the reasons set forth hereinafter, this Court has concluded that the group of communications subject to the requirements of § 10 is actually a sub-group of the larger group of communications falling within the § 2(10) definition of the term "prospectus."

In essence, § 10 requires that a "prospectus" contain, with certain exceptions, the information set forth in the registration statement required by § 5 of the 1933 Act, 15 U.S.C. § 77e. Indeed, it is through § 5 that the requirements of § 10 are enforced. Section 5(b)(1) provides in relevant part:

> It shall be unlawful for any person, directly or indirectly ... to carry or transmit any prospectus *relating to any security with respect to which a registration statement has been filed* under [the 1933 Act], unless such prospectus meets the requirements of section 10[.] (emphasis added).

In other words, a "prospectus" must meet the requirements of § 10 only if the prospectus relates to a security for which a registration statement has been filed. However, a registration statement need not be filed every time a security is offered or sold. Indeed, § 3 and § 4 of the 1933 Act, 15 U.S.C. §§ 77c and 77d, exempt a significant number of securities and transactions from the registration requirement of § 5. Thus, the requirements of § 10 apply only to a limited number of securities and transactions.

In contrast to § 10, § 12(2) applies to *all* transactions and all securities, even those which are the subject of the § 3 and § 4 exemptions. *See*, Loss, *Fundamentals of Securities Regulation* 887. By its terms, § 4 exempts certain transactions from the registration requirements of § 5, but does not purport to exempt these transactions from the requirements of § 12(2). Conversely, § 12(2) by its own terms applies to those securities which are generally exempted under § 3 from the requirements of the 1933 Act.[10] Under these circumstances, it is apparent to this Court that § 12(2) applies to a larger number of transactions and securities than does § 10. To conclude, as did the Court in *Ballay*, that § 12(2) must be limited to those situations in which § 10 applies, 925 F.2d at 688, ignores the plain language of § 12(2). These considerations accordingly convince this Court that the term "prospectus" in § 12(2) must be defined not by the narrow use of the same word in § 10, but rather by the general definition of "prospectus" contained in § 2(10).[11]

These observations undermine the conclusions reached by the Court in *Ballay* concerning the structure of the 1933 Act. In *Ballay*, the Court noted that § 12(2) is preceded by § 12(1) and § 11, and that it is followed by § 13 which provides the statute of limitations for §§ 11 and 12. The Court then observed that "[a]ll of these sections deal with initial distributions," and went on to conclude that, "Congress' placement of section 12(2) squarely among 1933 Act provisions concerned solely with initial distributions of securities indicates that it designed section 12(2) to protect buyers of initial of-

---

10. There is one exception not relevant here. *See* § 3(a)(2) of the 1933 Act, 15 U.S.C. § 77c(a)(2).

11. In addition, the fact that § 12(2) applies to securities not subject to the registration require-

ment of § 5 indicates that the securities upon which a § 12(2) claim are based need not be "traced" to a defective registration statement. *See, Barnes*, 373 F.2d at 272.

fers against fraud and misrepresentation." 925 F.2d at 691. However, § 12(2) in fact marks a shift in the focus of the 1933 Act. While §§ 11 and 12(1) apply only to securities and transactions subject to the registration requirements of § 5, § 12(2) by its terms applies to *all* securities and transactions subject to the 1933 Act. *See, Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1390 (7th Cir.1990) (Easterbrook, J.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991) (comparing scope of these three sections and stating, in *dictum*, that § 12(2) would apply to an open market transaction). Thus, this Court must disagree with the conclusion reached by the Third Circuit in *Ballay* concerning the "structure" of the 1933 Act. That reasoning is based on little more than the location of § 12(2) in the 1933 Act and ignores other provisions of the Act which reveal its true structure.

In sum, this Court is not convinced that the term "prospectus" in § 12(2) should be interpreted by reference to any statutory provision other than the explicit definition of the term in § 2(10). As noted above, § 2(10) defines "prospectus" as a written or broadcast communication which offers or confirms the sale of a security. The terms "offer" and "sale" have been interpreted by the Supreme Court as including transactions occurring in the course of ordinary market trading. *Naftalin*, 441 U.S. at 778, 99 S.Ct. at 2084. Thus, since a "prospectus" is merely a communication connected with such an offer or sale, the term "prospectus" must also be interpreted as applying to open market transactions. For these reasons, this Court has concluded that § 12(2) does apply to open market transactions.[12]

(c)

*Common Law Fraud*

■ Under Maryland law,[13] the elements of common law fraud are: (1) that a representation made by the defendant was false; (2) that the false statement was made knowingly or with reckless indifference to the truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied upon the misrepresentation; and (5) that the plaintiff suffered damage directly resulting from the misrepresentation. *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982). In support of the pending motion, defendants contend that the complaint fails to sufficiently plead several of these elements. In particular, defendants contend: (1) that the complaint fails to allege that defendants made any false representations; (2) that the complaint fails to allege that the defendants acted with scienter; and (3) that the complaint fails to allege facts tending to show reliance on the part of the plaintiffs. The Court has concluded that there is no merit to any of these contentions.

■ First, defendants argue that the complaint fails to allege that defendants made any false representations. Defendants further assert that, if their claim of fraud is based on concealment rather than on an affirmative misrepresentation, the plaintiffs must allege a "special relationship" giving rise to a duty to disclose. These contentions are meritless. Plaintiffs' claim of fraud is not based upon "concealment," but rather upon affirmative misrepresentations or omissions of material fact made by defendants by way of particular statements. It is therefore apparent that plaintiffs have adequately alleged that defendants made false representations.

Second, defendants argue that the complaint fails to allege that defendants acted with scienter. This argument must also be rejected. The complaint specifically alleges

---

**12.** As the Court noted at the hearing on the pending motion, § 12(2) states that a seller "shall be liable to the person purchasing such security from him." Thus, if plaintiffs purchased Marriott bonds from sellers other than the defendants, § 12(2) may not apply. *See, Pinter v. Dahl*, 486 U.S. 622, 644 n. 21, 108 S.Ct. 2063, 2077 n. 21, 100 L.Ed.2d 658 (1988). However, this issue was neither briefed nor argued by the parties, and at this stage of the proceedings, the Court expresses no opinion as to the effect, if

any, of this language. In any event, the complaint does not identify the sellers of the bonds purchased by some of the plaintiffs on the open market.

**13.** In discussing plaintiffs' fraud and negligent misrepresentation claims, both sides cite Maryland cases and apparently agree that Maryland law applies.

that defendants knew of the planned Restructuring at the time the bonds were issued, and that the motive for concealing the Restructuring was to increase the value of the equity interests of the individual defendants in Marriott Corporation at the expense of Marriott's bondholders. Accordingly, the Court is satisfied that plaintiffs have adequately alleged that defendants acted with the requisite scienter.

Third, defendants contend that the complaint fails to allege facts tending to show reliance on the part of the plaintiffs. This contention is likewise without merit. The complaint clearly alleges that plaintiffs were induced to purchase Marriott bonds by the alleged misrepresentations and omissions of defendants. Reliance has thus been adequately alleged.

Accordingly, the Court concludes that plaintiffs' complaint has stated under Maryland law a proper claim of common law fraud.

### (d)

### *Negligent Misrepresentation*

Defendants contend that plaintiffs have failed to state a proper claim of negligent misrepresentation because the complaint does not allege an "intimate nexus" between plaintiffs and defendants. This Court would agree.

■ Where, as here, the alleged negligent misrepresentation creates a risk of economic loss only, Maryland law requires plaintiffs to show an "intimate nexus" giving rise to a duty on the part of defendants to disclose information with care. *Jacques v. First National Bank,* 307 Md. 527, 534, 515 A.2d 756 (1986). This intimate nexus may be satisfied by "contractual privity or its equivalent." *Id.* at 534–535, 515 A.2d 756. In *Tischler v. Baltimore Bancorp,* 801 F.Supp. 1493 (D.Md. 1992), Judge Garbis reviewed the Maryland case law of negligent misrepresentation and concluded that no "intimate nexus" existed between a bank and its shareholders in a case involving an allegedly fraudulent press release. *Id.* at 1503–1506. The basis for this

conclusion was that the press release was aimed at the "general universe" rather than at any identifiable group of individuals. *Id.* at 1506.

■ The rationale of *Tischler* is controlling in this case. Plaintiffs allege that defendants' misrepresentations were contained in documents filed with the S.E.C. and in related public statements. These communications are no different from the press release at issue in *Tischler.* In both cases, the communications were aimed at the "general universe," and not at an identifiable group of individuals. From the allegations of the complaint, it is apparent that nothing resembling an "intimate nexus" existed between plaintiffs and defendants in this case. Plaintiffs have therefore failed to state a proper claim of negligent misrepresentation under Maryland law.

Accordingly, the Court has concluded that Count V must be dismissed.

### (e)

### *Bonds Purchased Before April of 1992*

■ The complaint alleges that defendants commenced the planning of the Restructuring "no later than January 1, 1992." However, the complaint fails to identify a single fraudulent or misleading statement made by any of the defendants before the April, 1992 filing of Marriott's Form 10–K. Nor have plaintiffs suggested any principle of law which would have required defendants to reveal the planned Restructuring at any time prior to the filing of the 1992 Form 10–K.

For these reasons, plaintiffs cannot in this case seek a recovery for Marriott bonds purchased before April of 1992. Accordingly, the Court has concluded that claims of the plaintiffs based upon bonds purchased before April of 1992, must be dismissed.[14]

### III

### *Conclusion*

For the reasons stated herein, it is this 22nd day of April, 1993, by the United States District Court for the District of Maryland,

ORDERED:

---

**14.** This ruling would apply to the claims of plaintiff Transamerica Life Insurance & Annuity Company based upon bonds purchased on January 27, 1992, and February 12, 1992, and also to the claims of plaintiff Transamerica Income Shares, Inc. based upon bonds purchased on January 28, 1992.

1. That defendants' motion to dismiss or in the alternative for partial summary judgment, treated herein solely as a motion to dismiss, be and the same is hereby granted in part and denied in part;

2. That defendants' motion to dismiss Counts I, II, III and IV of the first amended complaint be and the same is hereby denied;

3. That defendants' motion to dismiss Count V of the first amended complaint be and the same is hereby granted;

4. That all claims in plaintiffs' first amended complaint, to the extent that they are based upon bonds purchased before April of 1992, be and same are hereby dismissed; and

5. That defendants should file an answer to plaintiffs' first amended complaint within 15 days.