UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

REARDON COMMERCIAL INTERIORS,
INCORPORATED,
Plaintiff-Appellant,

v.

No. 97-1363

ADDEN FURNITURE, INCORPORATED;
P. T. SALES, INCORPORATED; RICHARD
BENN, individually,
Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-96-1091-A)

Argued: December 3, 1997

Decided: February 24, 1998

Before NIEMEYER and WILLIAMS, Circuit Judges, and
JONES, United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Jones wrote the opinion, in
which Judge Niemeyer and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** George Wendall Campbell, Jr., Arlington, Virginia, for
Appellant. James Macon Saunders, HUDGINS, CARTER & COLE-

MAN, Alexandria, Virginia, for Appellee Adden Furniture; Melissa Sue Hogue, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, P.C., Fairfax, Virginia, for Appellees P.T. Sales and Benn.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

JONES, District Judge:

Reardon Commercial Interiors, Incorporated ("Reardon") brought suit against Adden Furniture, Incorporated ("Adden"), P.T. Sales, Incorporated ("P.T. Sales"), and Richard Benn ("Benn"), alleging a variety of commercial torts resulting from purported interference with Reardon's contract with the University of Maryland Medical Systems ("UMMS"). Reardon now appeals the district court's grant of the defendants' motions to dismiss and for summary judgment. Reardon argues that the district court erred by: (1) dismissing Reardon's claims of breach of fiduciary duty and fraud (2) striking its claim for loss of future business; and (3) granting the appellees' motions for summary judgment on Reardon's claims of commercial defamation, interference with contractual relations, interference with prospective business advantage, and interference with lawful business. We affirm.

I

Reardon is a small business engaged in space planning, interior design, and the sale, delivery, and installation of commercial furniture and accessories. From the time of Reardon's inception in 1991, its primary customer was UMMS, of Baltimore, Maryland. UMMS was engaged in extensive renovations of its hospital complex and on December 1, 1992, UMMS entered into a three year agreement for the purchase of furniture from Reardon. The contract provided that Reardon would provide furniture specified in "furniture standards books," which were to be compiled by Reardon. The furniture specified was

2

furniture known as "case goods," i.e., wood furniture.[1] The defendant Adden is a furniture manufacturer, but no furniture made by Adden was included in the furniture standards books. In addition to acquiring furniture for UMMS, Reardon also was to provide certain other services including interior design and furniture installation. The contract began on December 1, 1992, and terminated on November 30, 1995. The contract also allowed UMMS a two year renewal option.

In March 1994, UMMS asked Reardon to arrange the purchase and installation of furniture in a particular section of the hospital. Betty C. Reardon, an officer of Reardon, suggested the hospital use Adden in place of another manufacturer in order to save money. UMMS agreed and Reardon purchased approximately $100,000 of furniture from Adden. Reardon paid for the order despite a variety of problems with the furniture. Working with Adden, Reardon spent the following twelve months correcting the problems. In the spring of 1995, Benn, the primary officer of P.T. Sales, Adden's independent sales representative for Maryland, became involved with the efforts to correct the problems.[2] In this capacity, Benn worked directly with Betty Reardon, who repeatedly identified her company to him as UMMS's "primary vendor" for case goods. Benn also visited UMMS on a number of occasions and had direct contact with UMMS officials while working to resolve the problems with the Adden order.

In the summer of 1995, Reardon ordered an additional $10,000 of Adden furniture for the hospital. In response to the continued failure of Adden to correct the problems with the initial furniture, Reardon did not immediately pay the second invoice. In November 1995, satisfied that sufficient progress had been made by Adden to remedy the difficulties with the initial order, Reardon paid fifty percent of the invoice and conditioned payment in full upon resolution of the remaining problems.

_____

[1] UMMS did not obtain all of its furniture through Reardon. UMMS acquired "system furniture," such as cubicles and computer furniture, from other suppliers, including direct purchases from manufacturers.
[2] P.T. Sales receives a commission for any sale of Adden furniture in P.T. Sales' district, regardless of whether P.T. Sales actually procures the sale.

In November 1995, UMMS met with Betty Reardon and Ella Ames, a Reardon employee, to discuss UMMS's extension option on the Reardon contract. Barry Rider, of UMMS's procurement department, advised that there had been numerous complaints from UMMS officials about Reardon, including poor service, high prices, and inferior products. Consequently, Reardon was informed that the contract would not be extended. UMMS provided Reardon with written confirmation of the decision not to renew and also requested that Reardon "remain [UMMS's] supplier [until May 30, 1996], providing all services as outlined in the original contract." (J.A. 531.)

In January 1996, UMMS employed a new interior designer, Joan Lamanteer, to begin specifying furniture for the children's psychiatric wing at the hospital. Lamanteer contacted P.T. Sales and Nemschoff, a furniture manufacturer, for the purpose of comparing Adden and Nemschoff prices for furniture to be used in the wing. Pricing information was delivered in January 1996, and Stan Latimer, UMMS project manager, sent the pricing information to Reardon. Reardon contacted Lorraine LaFabvre of Adden for a quote on the cost of freight, explaining that Reardon already had the price quote on the furniture. LaFabvre responded with the information and notified Benn of Reardon's request in order to make Benn aware of a potential sale in his territory.

On February 1, 1996, Reardon sent Latimer its quote for ordering and installing the Adden furniture. Subsequently, however, Betty Reardon decided that the furniture specified by Lamanteer was inappropriate for the psychiatric wing because it did not have proper safety features. Betty Reardon then began selecting more appropriate Adden furniture. On February 4, UMMS informed Lamanteer that the furniture needed to be in place by April 1, because of a scheduled inspection. Lamanteer contacted Benn to explain that there was some urgency with regard to the order. Benn contacted Adden's vice president of sales, Bruce Pike, to discuss the timing of the delivery. Pike also stated that at some point, he had discussed Reardon's credit status with Benn, and that he had made Benn aware of the fact that Reardon had not paid its last invoice in full. Pike also recalled Benn suggesting that Benn offer UMMS the opportunity to buy direct, an idea which Pike felt was within Benn's authority as Adden's representative in the area.

4

On February 7, John Sacco, a Reardon employee, faxed Benn a request for pricing on the new list compiled by Betty Reardon. On February 8, Benn met with Barry Rider of UMMS and informed him that: (1) Reardon had a past due account with Adden and that Reardon was on "credit hold"; (2) Adden no longer wished to do business with Reardon; and (3) Benn could obtain the furniture direct from Adden. Rider was not concerned about the comment regarding the credit hold, and later explained that:

> To me [credit hold] is not a significant term, in that it usually means there is some invoice that is discrepant and, I guess, it reaches a certain frustration level and the company puts you on credit hold. They are not going to deal with you until you resolve this discrepant invoice. It is not unusual. It really didn't concern me to hear that [Reardon] may be on credit hold with Adden Furniture.

(J.A. 118-19.)

Later on February 8, LaFabvre faxed Reardon the requested pricing information. At Benn's direction, LaFabvre simultaneously faxed the same price quote to Rider. LaFabvre felt there was a"conflict" in faxing the same price quotes to both Reardon and UMMS and consequently she sought advice from Pike. Pike instructed her to follow Benn's directions. Pike later acknowledged that he had been aware that it would be very difficult for Reardon to consummate the sale with UMMS because Adden was offering UMMS the opportunity to buy direct at the same discounted prices offered to Reardon.

On February 12, 1996, as yet unaware that Adden had offered to allow UMMS to purchase direct, Reardon sent UMMS its new price quote. Subsequently, Betty Reardon learned of Benn's statements regarding Reardon's credit with Adden. She contacted Adden by letter and fax and confirmed with Adden that there was no credit hold. In response to Betty Reardon's inquiry, Adden's president provided her with a letter stating that Reardon's account was not on credit hold, but that Reardon had an outstanding balance. Reardon faxed the letter to Rider, who acknowledged receiving the letter and who also stated that he understood that there was no problem with Reardon's credit with Adden.

5

On February 14, Adden faxed UMMS a revised price quotation. On February 15, Latimer spoke with Ames and explained that UMMS had compared the Reardon quote of $27,962 with the Adden quote of $17,238. Latimer stated that UMMS would be willing to pay a reasonable markup but that the difference in the two quotes was exorbitant and that Reardon would have to reduce its markup.**3** Betty Reardon spoke with Latimer on February 19, and explained that Reardon could not adjust its price and still make a profit. Latimer responded that he could not ignore a $10,724 price difference, representing a thirty-eight percent markup, and that he would have to go with the better price. Accordingly, UMMS purchased the furniture directly from Adden.

Thereafter, Reardon filed the present suit, contending that the appellees' actions resulted in commercial defamation, trade libel, interference with contractual relations, interference with prospective business advantage, interference with lawful business, conversion, loss of future business, breach of fiduciary duty, and fraud. Reardon's claims for trade libel, conversion, breach of fiduciary duty, and fraud, were dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Subsequently, the district court also struck Reardon's claims for "loss of future business," pursuant to Fed. R. Civ. P. 37. On February 14, 1997, the district court granted the appellees' motions for summary judgment with regard to Reardon's remaining claims. Reardon now appeals the district court's dismissal of its claims for breach of fiduciary duty and fraud, the striking of its claim for loss of future business, and the granting of summary judgment on its claims for commercial defamation, interference with contractual relations, interference with prospective business advantage, and interference with lawful business.

II

We review the district court's decision to grant the appellees' motion to dismiss de novo. Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir. 1997). We accept the factual allegations in the plaintiff's complaint and must construe those facts in the light most favorable to the plaintiff. Id. We may affirm the district court's dismissal only if it appears beyond doubt that the plaintiff can prove no

_____

**3** UMMS suggested that a ten to fifteen percent markup was reasonable.

6

set of facts in support of its claim that would entitle it to relief. Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989).

We also review the district court's grant of summary judgment de novo. Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 928 (4th Cir. 1995). In order to prevail on a motion for summary judgment the moving party must establish the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the moving party carries its burden, the nonmoving party may not rest on the allegations in its pleadings, but must produce sufficient evidence that demonstrates that a genuine issue exists for trial. Id. at 324.

III

Reardon asserts that because the appellees were aware of Reardon's relationship with UMMS and because Adden and P.T. Sales stood in a position of trust with regard to Reardon's efforts to consummate a sale with UMMS, the appellees violated their fiduciary duties when they permitted UMMS to buy direct from Adden.[4]

Under Maryland law,[5] a fiduciary or confidential relation exists "in

_____

[4] As a preliminary matter, the appellees argue that Reardon is barred from appealing the dismissal of Reardon's claims of breach of fiduciary duty and fraud because Reardon failed to specify those dismissals in its notice of appeal. Reardon's claim of breach of fiduciary duty was dismissed by order entered November 1, 1996. Reardon's claim of fraud was dismissed by order entered January 13, 1997. The notice of appeal was filed on March 14, 1997. In pertinent part it noted an appeal to this court only from the order "sustaining the Defendants' Motion for Summary Judgment and Dismissal of this cause entered in this action on February 14, 1997." (Appellees' Brief at 22.) Because we find that the appellees had notice and the opportunity to fully brief all of the issues, we hold there was no prejudice and therefore find that any deficiency in the notice does not limit consideration of the appeal. See Canady v. Crestar Mortgage Corp., 109 F.3d 969, 974 (4th Cir. 1997).
[5] The district court made a choice of law determination to apply Maryland law and that ruling is unchallenged on appeal.

7

all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing the confidence." Anderson v. Watson, 118 A. 569 (Md. 1922); Travel Committee Inc. v. Pan American World Airways, Inc., 603 A.2d 1301 (Md. App. 1992). However, Maryland courts have found that a fiduciary duty does not arise merely because the parties have a business relationship or even where there exist intricate contractual relations. Travel Committee, 603 A.2d at 1322.

Here, Reardon's complaint contained no factual allegation of a relationship of special trust or confidence sufficient to serve as a framework for the creation of a fiduciary duty. Reardon merely alleged that because Adden was involved in providing price quotes to Reardon and was aware of Reardon's relationship with UMMS, a fiduciary relationship was created. Although we accept these factual allegations as true, they are plainly insufficient to establish a fiduciary relationship.

IV

Reardon contends that the appellees fraudulently lead Reardon to believe that it could acquire furniture from Adden for resale to UMMS, while in fact, the appellees attempted to usurp the sale by making a direct offer to UMMS. We conclude that the district court properly dismissed this claim pursuant to Fed. R. Civ. P. 12(b)(6).

Fed. R. Civ. P. 9(b) requires averments of fraud to be stated with particularity. While elucidation of every detail of the alleged fraud is not required, more than a bare assertion that such a cause of action exists is necessary. PPM America, Inc. v. Marriott Corp., 820 F. Supp. 970, 973 (D. Md. 1993). In general, this requires a particular statement of the circumstances of the alleged fraud, including "the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [was] obtained thereby." Windsor Associates, Inc. v. Greenfeld, 564 F. Supp. 273, 280 (D. Md. 1983) (citation omitted).

Moreover, under Maryland law, to prove fraud Reardon would bear the burden of proving (1) that a representation was false; (2) that the

8

false statement was made knowingly or with reckless indifference to the truth; (3) that the misrepresentation was made for the purpose of defrauding Reardon; (4) that the misrepresentation was relied upon; and (5) that Reardon suffered damages resulting directly from the misrepresentation. Bishop v. E.A. Strout Realty Agency, 182 F.2d 503, 505 (4th Cir. 1950); PPM America, Inc., 820 F. Supp. at 978.

In Reardon's motion to amend its complaint to add a charge of fraud, Reardon made the following allegation in support of its claim:

> Adden, P.T. Sales, and Benn induced Reardon to continue in [its] negotiations with the UMMS at the same time Adden was delivering quotations to both Reardon and to the UMMS in order to sell the furniture directly to the hospital. This conduct resulted in the defendants jointly misrepresenting their intent to do business with Reardon, on which Reardon relied, while at the same time attempting to undercut Reardon's sales price by offering the hospital a sale of furniture at the manufacturer's net price.

(J.A. 289-90.) Such allegations satisfy neither the requirements of Fed. R. Civ. P. 9(b) nor Maryland law, because they fail to allege that the defendants made any false representations. Reardon's account of the facts states that Adden provided both Reardon and UMMS with legitimate price quotes and the opportunity to purchase the quoted furniture. While Reardon may be justified in characterizing the appellees' actions as "undercutting" Reardon's position with UMMS, Reardon's pleading of fraud is nevertheless insufficient on its face because Reardon fails to point to any false statements made by the appellees. Accordingly, the district court properly concluded that "[b]ecause there was nothing false about defendants' representations and because defendants' had no contractual obligation prohibiting them from discussing prices with UMMS," the complaint must be dismissed.

In its brief to this court, Reardon asserts for the first time that the false statements made by Benn to UMMS regarding Reardon's credit status with Adden constituted the false representations necessary to prove fraud. While Reardon described these statements in its initial complaint, Reardon's assertion of fraud made no reference to these statements. This conspicuous absence of any reference, however, is

9

unremarkable when considered in the context of the fraud charge as it was originally presented to the district court. As charged in Reardon's complaint, the fraud committed was the appellees' representation to Reardon that they wished to do business with Reardon, not Benn's fraudulent representations to Rider regarding Reardon's credit. By its own admission, the representation Reardon relied upon was Adden's representation to Reardon that Adden would do business with it. Benn's statements, while false, were made to UMMS, not Reardon, and cannot now be understood to have been a part of the allegedly fraudulent representation initially identified by Reardon as cause for its claim of fraud. Accordingly, we conclude that Benn's statements provide no support for Reardon's fraud claim, and we therefore hold that the district court did not err in dismissing the claim.

Moreover, even were we to hold that Reardon had articulated a claim of fraud properly premised on Benn's statements, such a claim would nevertheless fail as a matter of law. To prove fraud on the basis of Benn's statements, Reardon would bear the burden of showing that it "suffered damages resulting directly from the misrepresentation." Bishop, 182 F.2d at 505. It is undisputed that Benn's statements that Reardon was on "credit hold" and that Adden no longer wished to do business with Reardon were false. However, the record does not support a finding that Benn's statements influenced UMMS's relationship with Reardon, or otherwise resulted in any damage to Reardon. To the contrary, Rider stated that he believed credit holds to be routine and that Benn's statements did not concern him.

The record also reflects that before UMMS took any action on the final Adden sale, UMMS was aware, as a result of Adden's letter, that although Reardon's account with Adden was past due, Adden had not placed Reardon on credit hold nor refused to do business with Reardon. The fact that UMMS contacted Reardon after the meeting with Benn in order to give Reardon the opportunity to lower its markup and close the sale, illustrates that Benn's statements had no impact on Reardon's relationship with UMMS and that in fact, it was Reardon's failure to lower its markup that cost Reardon the sale.

V

Reardon contends that the appellees' interference with Reardon's business relationship with UMMS entitles Reardon to the future prof-

10

its Reardon would have received as a result of its dealings with UMMS. See Fowler v. Printers II, Inc., 598 A.2d 794, 807 (Md. App. 1991). Specifically, Reardon asserts that but for the appellees' interference, Reardon would have at least profited from the final Adden sale, that Reardon could have earned additional profits during the remainder of the six month extension, and that an additional extension might have been granted.

As noted previously, the record reflects that it was not the appellees' interference, but rather Reardon's refusal to lower its price, that cost Reardon the sale. As the district court noted, "even after Benn revealed Adden's net figures, UMMS was willing to do business with [Reardon] but at a lower mark-up. [Reardon] refused to negotiate lower prices. . . . [T]he unrefuted evidence . . . is that [Reardon's] own conduct undermined its business dealings with UMMS." Further, the record is devoid of evidence suggesting that the appellees' actions contributed to the decision of UMMS not to renew Reardon's contract. Likewise, there is no evidence that but for the appellees' actions, Reardon would have been offered another opportunity to make additional purchases for UMMS or that Reardon would have received another contract extension. Accordingly, we find no evidence that the appellees' actions deprived Reardon of any future profits and therefore hold that the district did not err in striking the claim.

VI

Reardon argues that Benn's statements regarding Reardon's credit worthiness constituted per se defamation, or in the alternative, per quod defamation. To establish a prima facie case of defamation where the plaintiff is not a public figure, the plaintiff must show:

> (1) that the defendant made a defamatory communication-- i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

Shapiro v. Massengill, 661 A.2d 202, 216-17 (Md. App. 1995). In the case of per se defamation, the plaintiff need not prove actual damages

11

because "[i]n the case of words or conduct actionable per se their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice." Id . at 217. Where the defamation is per quod, "the injurious effect must be established by allegations and proof of special damage and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage." Id.

The evidence presented fails to support a claim of defamation of either type. Under either theory there must be proof that a statement was made "to a third person who reasonably recognized the statement as being defamatory." Id. at 216 (emphasis added). While Benn's comments may be considered to rise to the level of malicious statements made with the intent to harm Reardon, the record is replete with evidence showing that Rider did not perceive the statements as defamatory. He stated in his deposition that he understood "credit holds" to be a routine matter of doing business and that he was not otherwise concerned by Benn's statements. Moreover, Rider ultimately offered Reardon the opportunity to conclude the sale, definitively showing that Benn's statements had no impact.

VII

Reardon contends that the appellees' actions constituted interference with Reardon's contractual relations with UMMS. Under Maryland law, to prove a claim of tortious interference the plaintiff must show (1) the existence of a contract between the plaintiff and a third-party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff. Fowler, 598 A.2d at 802.

While it appears that the question of the appellees' alleged interference might present an issue of material fact for the jury, the evidence does not support Reardon's claim that UMMS breached the contract. In pertinent part, Reardon's contract provided that"[Reardon] shall sell and [UMMS] shall buy the furniture specified in the Furniture Standards Books, and the accompanying Specified Services, referenced hereto . . . ." The contract did not specifically limit UMMS to

12

furniture purchases through Reardon, nor did it require UMMS to purchase furniture listed in the furniture standards books exclusively from Reardon.

Further, even were we to find that UMMS was contractually required to purchase all case goods listed in the furniture standards books through Reardon, Reardon's claim would still fail because at no time was Adden furniture so listed. Reardon recognizes this fact, but argues that in its course of dealings with UMMS, the contract was modified by the parties' conduct. Reardon contends that because UMMS purchased a variety of furniture not listed in the furniture standard books through Reardon, Reardon became UMMS's prime vendor for all "case goods," regardless of whether they were included in the books. We find this argument unpersuasive, based on the record. The evidence reflects that UMMS occasionally chose to order through Reardon furniture not included in the standards books. However, no evidence was presented showing that either party ever understood that by making such orders, UMMS was committing itself to order all case goods through Reardon. To the contrary, the record reflects that UMMS had this option, but was not precluded from and in fact did order through other companies and directly from manufacturers.

VIII

Reardon asserts that the appellees intentionally interfered with Reardon's prospective business advantage. To prove such a claim, Reardon must establish: (1) an intentional and willful act; (2) calculated to cause damage; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the appellees (which constitutes malice); and (4) resulting damages. Bagwell v. Peninsula Regional Medical Ctr., 665 A.2d 297, 314 (Md. 1995).

For the reasons previously stated, Reardon cannot prevail on such a claim. Even were Reardon to succeeded in establishing the first four elements of this tort, the record fails to provide any proof that Reardon suffered any actual damage or loss as a result of any actions taken by the appellees individually or collectively. Again, we note that the record establishes that Reardon's contract was not renewed for rea-

13

sons entirely unrelated to the issues in this case and that the final Adden sale was lost because Reardon would not adjust its markup.

IX

Reardon's final contention is that the appellees' actions constituted interference with Reardon's lawful business. Maryland law does not recognize a separate tort of interference with lawful business, Bagwell, 665 A.2d at 313-14, and the district court was correct in dismissing the claim.

X

For the foregoing reasons, and based on a careful consideration of the record, we affirm.

AFFIRMED

14